**Aoas COLAYONG, Appellant,**

**v.**

**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.**

**No. 97–1178.**

United States Court of Appeals for Veterans Claims.

Argued June 15, 1999.

Decided Aug. 17, 1999.

Marshall O. Potter, Jr., for the appellant.

Peter M. Donawick, with whom Leigh A. Bradley, General Counsel; Ron Garvin, Assistant General Counsel; and Carolyn F. Washington, Deputy Assistant General Counsel, were on the brief, for the appellee.

Before NEBEKER, Chief Judge, and HOLDAWAY and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, World War II veteran Aoas Colayong, appeals through counsel a May 22, 1997, Board of Veterans' Appeals (BVA or Board) decision denying a claim for an increased rating above 60% for Department of Veterans Affairs (VA) service-connected Pott's disease and denying a claim for a rating of total disability based on unemployability (TDIU). Record (R.) at 12. The appellant has filed a brief and a reply brief, and the Secretary has filed a brief. This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will reverse the BVA decision as to the TDIU claim and vacate it as to the rating-increase claim for Pott's disease and remand those matters for proceedings consistent with this opinion.

## I. Background

The veteran had recognized World War II guerilla service in the Philippines from January 1943 until March 1945. R. at 15–16. In an April 1950 VA medical examination report, the VA examining physician noted: "During operations against the enemy ... [in] 1943, he was hit by a bullet at the right

chest and left leg and he fell into a precipice and in so falling he sustained injury to his spinal column. He was treated by a guerrilla doctor." R. at 203. That physician diagnosed the veteran as having, inter alia, active Pott's disease in the lumbo-dorsal back area and reinfection-type chronic pulmonary tuberculosis (PTB) on the right side, which was active, although minimal. R. at 204. (Pott's disease, also known as tuberculosis (TB) of the spine, is "osteitis [(inflammation of bone)] or caries [(bone decay)] of the vertebrae, usually occurring as a complication of tuberculosis of the lungs; it is marked by stiffness of the vertebral column, pain on motion, tenderness on pressure, prominence of certain of the vertebral spines, and occasionally abdominal pain, abscess formation, and paralysis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (DORLAND'S) 270, 1198, 1343, 1757 (28th ed.1994). Lumbo-dorsal "pertain[s] to the lumbar and thoracic (formally called dorsal) regions." Id. at 962. Thoracic is the thorax or chest area and lumbar is between the thorax and the pelvis. Id. at 961, 1705.)

In April 1951, a VA physician diagnosed the veteran as having Pott's disease of the lumbo-dorsal area, inactive, and PTB, reinfection type, minimal, active, slight symptoms. R. at 207–08. A February 1957 VA medical report indicated diagnoses of Pott's disease of the dorso-lumbar junction and chronic, minimal PTB, both inactive. R. at 215–16. A February 1968 VA medical examination report noted dorso-lumbar kyphotic deformity, with marked protrusion of vertebral column producing angulation and practically no motion of the spine and included diagnoses of active lumbo-dorsal Pott's disease and hypertrophic degenerative disease at L3 and L4 (lumbar) but no PTB. R. at 226–27, 234. (Kyphotic means affected with or pertaining to kyphosis, which is "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback". DORLAND'S at 890.) That report also described the veteran's back as markedly kyphotic with gibbus at the lower thoracic and upper lumbar spine and noted

that there was limitation of motion of the spinal column in all directions and fusion of D11–D12 and L1–L3 with complete obliteration of intervening intervertebral spaces. R. at 228, 232. (Gibbus is "a hump". DORLAND'S at 690.) In order to check the veteran's eyesight the physician used an eye chart for illiterate patients. R. at 225, 227.

In a January 15, 1973 VA medical examination, the physician found marked kyphotic deformity of D11, D12, and L1–L3, with a hump at L1; 10 degree forward flexion and practically no extension, side-to-side movement, or rotation. R. at 238. The diagnoses in that report included "Pott's disease D11 to L3, unchanged from 1–16–69 to 1–15–73" (no examination reports dated between the January 16, 1969, and January 15, 1973, medical reports cited are in the record on appeal), with kyphotic deformity and complete limitation of motion, and hypertrophic degenerative disease of the dorsal and lumbar spine. R. at 239, 243. The examining physician noted that the veteran complained of back pain. R. at 236.

In a December 1976 letter to the VA Philippines Regional Office in Manilla (RO), the veteran requested additional VA assistance on the ground that he was unemployed due to the worsening of his service-connected disabilities. R. at 245. In an April 1978 BVA decision, the Board denied increased ratings for the veteran's already service-connected Pott's disease (inactive and previously rated as 60% disabling pursuant to 38 C.F.R. § 4.71a, Diagnostic Code (DC) 5286 (1977)), residuals of a gunshot wound to the left leg (10%), and scar on the right chest (noncompensable). R. at 19–20. The Board noted that the combined rating for the veteran's service-connected disabilities was 60% and also denied a TDIU rating. R. at 20. The Board, in that BVA decision, did not specify, nor does the record on appeal before the Court (ROA) accurately demonstrate, exactly when the veteran was awarded service connection for those three disabilities or when the above ratings were assigned. The ROA does indicate, however, that the 60% rating was either assigned in June 1973 (*see* R. at

50) or effective as of January 1975 (R. at 113).

In February 1991, the veteran stated in a deposition taken by a VA representative that he was illiterate but could sign his name. R. at 23. In March 1993, the veteran again filed for increased ratings for his three service-connected disabilities. R. at 26. He enclosed with an April 19, 1993, letter to the VARO (R. at 30), a medical examination report written by Dr. Ponciano N. Lloren, a private physician, who asserted that he had been treating the veteran since March 31, 1993 (R. at 28). In that report, Dr. Lloren stated: "Examiner's observation shows spine, ankylosis and lumbar unf[a]vorable. Body is bent forward and impression of the examiner was that the patient ... is suffering from persistent sciatic neuritis with characteristic pain and demonstrable muscle spasm, absent tendons achillis [sic] refl[e]x or other nerve pathology appropriate to site of [P]ott's disease[ ], little intermittent relief." *Ibid.* (Ankylosis is "immobility and consolidation of a joint due to disease, injury, or surgical procedure." DORLAND'S at 86.) Dr. Lloren diagnosed the veteran as having "Pott's disease, residuals of gunshot wound, right chest and residual of gunshot wound left leg with limitation of flexion and extension" and opined: "Judging based on the above stated findings and diagnos[e]s, it is the opinion of the examiner that the patient ... is incapable of managing his own affairs and cannot execute performing activities for working to any manual work to lesser degree." R. at 28.

In a July 1993 VA medical examination report, the examining VA physician noted positive gibbus at T12–L1 as a postural abnormality, very minimal measurements on all planes for range of motion, and pain if force was applied to rotation of spine. R. at 38–39. That VA physician diagnosed the veteran as having, inter alia, "sacroiliac arthritis", "Pott's disease with kyphosis and complete LOM [limitation of motion]", and "degenerative hypertrophic disease [at] T10–T12 [and] L1–L2, with wedging deformity consistent with Pott's disease". R. at 39. (Arthritis is

"inflammation of joints." DORLAND'S at 140. Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells". *Id.* at 802. Sacroiliac is "the joint or articulation between the sacrum [ (triangular bone just below the lumbar vertebrae, formed usually by five fused vertebrae that are wedged dorsally between the two hip bones) ] and ilium [ (expansive superior portion of the hip bone) ]". *Id.* at 819, 1479.) A September 1993 VA medical review report of a TB board stated that the veteran did not currently have PTB and that his Pott's disease was inactive. R. at 32. In September 1993, the RO denied the rating-increase claims for Pott's disease, left-leg gunshot wound, and chest scar. R. at 49–50. In October 1993, the veteran filed a Notice of Disagreement (NOD) (R. at 55), and in November 1993 the RO issued a Statement of the Case (SOC) as to increased ratings for his service-connected disabilities; that SOC mentioned the July 1993 VA diagnosis of bilateral sacroiliac arthritis and degenerative joint disease of the dorsal and lumbar spine (R. at 59–60).

In a February 1994 letter to the RO, the veteran requested that the RO consider and review the issue of a "total rating" and stated that, because he could no longer "stand the strain" of his disabilities, his manual farm work was often interrupted and he could no longer do construction work or operate a vehicle. R. at 66. The veteran then filed a VA Form 9 (Substantive Appeal to the Board) in March 1994. R. at 69–74. He filed in May 1994 another VA Form 9, in which he noted the July 1993 VA diagnosis of bilateral sacroiliac arthritis and generally requested that the RO review his case for residuals of his Pott's disease. R. at 76, 79–80. In that Form 9, he also claimed severe pain due to his disabilities. R. at 80. In August 1994, he filed a formal TDIU claim. R. at 82–84.

In a September 1994 VA medical examination, the physician found that the veteran was humpbacked and kyphotic, with a fixed deformity as to forward flexion, no range of motion as to bilateral rotation, and 0 to 10

degrees of lateral flexion and backward extension; and had pain if rotation was forced. R. at 89–90. The physician diagnosed the veteran as having "moderate kyphosis and ankylosis, post traumatic T12–L3", and opined that the veteran's "deformity limited his ability to engage in activities that require movement of the trunk[, such as] bending, carrying objects, [and] prolonged walking". R. at 90. The report also noted that the veteran had reported "on and off back pain on prolonged sitting becoming worse recently." *Ibid.*

In a November 1994 letter to the RO, the veteran stated that the severity of his service-connected disabilities had worsened over the past five years to the point where he could no longer manage his affairs or perform manual work, including farm labor. R. at 106. He also stated that he was unemployable because he was totally disabled. *Ibid.* An accompanying October 1994 medical report from Dr. Lloren stated that the veteran's disabilities had increased in severity since 1987, that the veteran could not be recommended for any manual work or employment, and that the veteran was totally disabled. R. at 107. The doctor's findings were positive for gibbus at T12–L1 and for pain if force was applied to the rotation of the spine, and included a notation of a limited range of motion in all affected areas of the spine. R. at 107. As to the veteran's back condition, Dr. Lloren diagnosed the veteran as having an "[u]nfavorable angle, with marked deformity and involvement of major joints (Marie–Strumpell type) or without other joint involvement (Bechterew type)." *Ibid.*

In December 1994, the RO denied the three rating-increase claims and the TDIU claim (R. at 110–11); confirmed the combined rating of 60% (R. at 113); and issued a Supplemental SOC (SSOC) as to the rating-increase claims (R. at 117–19). The veteran argued in a December 1994 letter to the RO that the medical evidence of record established that his disabilities had worsened, and he stated that his disabilities prohibited him from securing a driver's license and that that prohibition resulted in his unemployment. R. at 123. He also contended that the evidence supported his rating-increase and TDIU claims. *Ibid.* He then submitted another letter to the RO accompanied by a Form 9 and a report from Dr. Lloren, all dated May 1995. R. at 128–36. Dr. Lloren found positive gibbus at T12–L1, range of motion of spine limited in all parts affected, positive pain if force was applied to rotation, and a back "angle with marked deformity and involvement of major joints (Marie–Strumpell type)"; diagnosed residuals of Pott's disease with kyphotic deformity and complete limitation of motion of parts affected; and noted that it had been recommended that the veteran's driver's license be revoked for safety reasons. R. at 135.

The veteran filed a statement in support of his claim in October 1995. R. at 147. In November 1995, the RO denied the TDIU claim (R. at 152–53) and issued an additional SSOC as to both the rating-increase and TDIU claims (R. at 155). In December 1995, the veteran filed a statement that he had failed to report for an October 1995 VA medical examination because his service-connected disabilities had worsened, thereby making him incapable of walking and riding in a vehicle for long distances. R. at 164. In a March 1996 BVA decision, the Board denied the veteran's left-leg-wound and chest-scar rating-increase claims (R. at 172) and remanded the Pott's disease rating-increase claim in order to provide the veteran with a VA medical examination to include comments on the presence or absence of unfavorable ankylosis pursuant to DC 5286 and to resolve differences in opinion as to the severity of the Pott's disease (R. at 174–75). The Board also remanded the TDIU claim as premature in light of the possibility that a 100% rating as to the schedular-rating-increase claim might be granted. R. at 174.

The Board-ordered VA orthopedic examination took place in August 1996. R. at 178–88. The orthopedic specialist found fixed kyphotic deformity at the thoracolumbar area and positive gibbus deformity (T12–L3), with a prominent back spine; forward flexion

was fixed; no rotation to either side; minimal backward extension and lateral flexion; and fusion of vertebrae involved. R. at 178–79. (Thoracolumbar "pertain[s] to the thoracic and lumbar parts of the spine." DORLAND's at 1705.) The report noted an objective finding of "positive pain over back area on motion". R. at 179. After a review of the x-rays taken at the time of the July 1993, September 1994, and August 1996 examinations, the specialist stated that, although there was no progression of the gibbus deformity, the veteran's pain and disability may be due in part to the excess stress on the remaining movable spine segments. *Ibid.* At the same time, a VA radiologist diagnosed the veteran as having wedging and kyphotic ankylosis of the thoracolumbar spine, as a result of Pott's disease and trauma, but noted that his condition was radiologically stable from July 1993 and September 1994; that specialist also diagnosed him as having degenerative disc disease and osteoarthritis in the rest of the thoracic spine and sacroiliac joints. R. at 188.

In an October 1, 1996, memorandum to the Chief Medical Officer (presumably at a VA medical facility in the Philippines), the RO stated:

1. This is a BVA remand. The veteran is service connected for Pott's disease with kyphotic deformity and complete limitation of motion evaluated at 60%. A private physician, not an orthopedic surgeon, has reported that the veteran's spine has complete bony fixation (ankylosis) with unfavorable angle and with marked deformity and involvement of major joints (Marie–Strumpell type) or without other joint involvement (Bechterew type). *This description of the veteran's spine is lifted verbatim from the Rating Schedule which would warrant the veteran a 100% evaluation.*

2. The veteran was examined on August 21, 1996. Kindly review the claims folder and provide us with an expert opinion as to whether the above description by the private physician matches the veteran's spine condition. You *might* want to review the

January 1973 examination and x-rays to determine if there is a significant increase in the severity compared to the 1993 and current examinations.

3. We will appreciate your resolving the above problem for us. *Please feel free to refute the private physician's report as fully as possible for a better argument.*

R. at 255 (emphasis added). On October 25, 1996, the VA Chief Medical Officer responded to the RO (R. at 190), attaching a medical opinion of the orthopedic surgeon who had examined the veteran in August 1996; that specialist wrote:

The spinal deformity (gibbus) would involve only the thoracolumbar area T12–L3. The [o]ther vertebrae above and below would still be functional. Hence, the claim for 100% complete bony fixation was unwarranted. The classification used of ankylosis with involvement of major joints (Marie–Strumpell type) or without other joint involved (Bechterew type) is applicable only for ankylosing spondylitis. This patient has [tuberculosis] of the spine or Pott's disease. The involved vertebrae T12–L3 have already fused while the other segments still have some motion. However, adding excessive stresses to the remaining moving segments increases the risk of degenerative changes. Also on X-ray—comparison of the sequential film shows no progression of the kyphotic deformity.

R. at 191. (Ankylosing spondylitis is a "form of rheumatoid arthritis that affects the spine[;] ... a systemic illness of unknown etiology, affecting young males predominantly, and producing pain and stiffness as a result of inflammation of the sacroiliac, intervertebral, and costovertebral joints; paraspinal calcification, with ossification and ankylosis of the spinal joints, may cause complete rigidity of the spine and thorax"; also known as Bekhterev's (or Bechterew's) arthritis or Marie–Strumpell disease. DORLAND's at 190, 1563.)

In February 1997, the RO issued a third SSOC that continued the 60% rating for

Pott's disease and denied TDIU. R. at 197. In March 1997, the veteran sent a letter to the RO requesting that his claim be forwarded to the Board. R. at 200. In the May 22, 1997, BVA decision here on appeal, the Board denied a rating above the current 60% for Pott's disease, including consideration of an extraschedular rating under 38 C.F.R. § 3.321(b) (1996) (R. at 7), and denied the TDIU claim (R. at 12). The Board also noted that the veteran's combined rating for his service-connected disabilities remained at 60%. R. at 8.

## II. Analysis

### A. Rating–Increase Claims

There are several avenues through which an appellant may obtain a 100% disability rating. *See Norris v. West,* 12 Vet. App. 413, 417–18 (1999); *see also Holland (Lee) v. Brown,* 6 Vet.App. 443, 446–47 (1994). The first option is through a schedular rating. "Under 38 U.S.C. § 1155, the Secretary is authorized to promulgate the Schedule of Rating Disabilities[, which] ... provides the degrees of impairment of average earning capability caused by a specific disability or a combination of disabilities listed in the Schedule ..., with a maximum rating of 100%, which is considered a total disability rating." *Norris, supra; see* 38 C.F.R. § 3.321(a) (1998); 38 C.F.R. Part 4 (1998). Where there is a question as to which of two evaluations is to be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating; otherwise, the lower rating will be assigned. *See* 38 C.F.R. § 4.7 (1998). All disabilities, including those arising from a single disease entity, are to be rated separately, and then all ratings are to be combined pursuant to 38 C.F.R. § 4.25 (1998), except as otherwise provided in the rating schedule. *See Esteban v. Brown,* 6 Vet.App. 259, 261 (1994). The second option, an extraschedular rating, applies in an exceptional or unusual case where a schedular rating is inadequate; in that instance, VA will consider whether "the case presents such an exceptional or unusual disability picture with such related factors as

marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards." 38 C.F.R. § 3.321(b) (1998); *Bagwell v. Brown,* 9 Vet.App. 337, 338–39 (1996); *Shipwash v. Brown,* 8 Vet. App. 218, 224 (1995); *Fisher (Raymond) v. Principi,* 4 Vet.App. 57, 60 (1993). As a third option, if the veteran has a certain level of schedular rating for a service-connected disability or disabilities and "[i]f the veteran presents evidence that he is unable to secure a substantially gainful occupation as a result of a service-connected disability, he may be entitled to a TDIU rating [pursuant to 38 C.F.R. § 4.16(a) (1998) ]", which is a 100% rating. *Norris, supra; see also* 38 C.F.R. § 4.16(b) (1998) (where veteran does not meet minimum schedular criteria set forth in § 4.16(a)).

### 1. Schedular Rating for Pott's Disease.

The appellant contends that the Board erred in failing to provide an adequate statement of reasons or bases as to his Pott's disease schedular-rating-increase claim (including a failure to consider his pain) and in relying on an examination that was inadequate for rating purposes. Appellant's Brief (Br.) at 9–12. The appellant also argues that, even if his current 60% rating is no longer appropriate, it is preserved under 38 U.S.C. § 110 and 38 C.F.R. § 3.951(b) (1998) (providing that a disability that has been rated at or above a certain percentage for 20 or more years may not be reduced except on a showing of fraud). Br. at 10. He also argues that pursuant to 38 C.F.R. § 4.7 the Board should have granted him a 100% schedular rating because his condition could have been rated under 38 C.F.R. § 4.71a, DC 5286 or 5289 (1998), and DC 5286 provided for a 100% rating. Br. at 10–11. The Secretary concedes that the Board failed to provide an adequate statement of reasons or bases to support its denial of the Pott's disease rating-increase claim because the Board determined that DC 5286 did not apply and that DC 5289 did apply (even though it then confirmed the 60% schedular rating, which exceeded the maximum allowed under DC

5289). Secretary's Br. at 7–9. Thus, the Secretary requests that the Court remand the claim for the Board to provide an adequate analysis under either DC 5286 or DC 5289. Br. at 7.

Consistent with the appellant's contention, the Court notes that there is evidence in the record that the appellant's 60% rating was granted at least as of January 1975, if not in June 1973. *See* R. at 50, 113. Thus, the Court concludes that the appellant's 60% rating for his service-connected Pott's disease is preserved by operation of law as having been in effect for at least 20 years. *See* 38 U.S.C. § 110; 38 C.F.R. § 3.951(b); *Salgado v. Brown,* 4 Vet.App. 316, 318 (1993).

■■ A claim for an increased rating is a new claim, not subject to the provisions of 38 U.S.C. §§ 7104(b) and 7105(c) prohibiting reopening of previously disallowed claims except upon new and material evidence under 38 U.S.C. § 5108. *See Proscelle v. Derwinski,* 2 Vet.App. 629, 631–32 (1992). An increased-rating claim is generally well grounded under 38 U.S.C. § 5107(a) when a claimant indicates that a service-connected disability has increased in severity. *See Arms v. West,* 12 Vet.App. 188, 200 (1999). Here, the veteran has asserted that he has sustained an increase in his disability (R. at 26), and the Court thus holds on de novo review that the rating-increase claim as to Pott's disease is well grounded.

■■ Pursuant to 38 U.S.C. § 5107(a), once a claimant has submitted a well-grounded claim, the Secretary is required to assist that claimant in developing the facts pertinent to the claim. *See* 38 C.F.R. § 3.159 (1998); *Littke v. Derwinski,* 1 Vet.App. 90, 91–92 (1990). Where the record does not adequately reveal the current state of the claimant's disability, the fulfillment of the section 5107(a) duty to assist may require a thorough and contemporaneous medical examination. *See Suttmann v. Brown,* 5 Vet. App. 127, 138 (1993); *Green (Victor) v. Derwinski,* 1 Vet.App. 121, 124 (1991). "If a diagnosis is not supported by the findings on the examination report or if the report does not contain sufficient detail, it is incumbent upon the rating board to return the report as inadequate for evaluation purposes." 38 C.F.R. § 4.2 (1998); *see also* 38 C.F.R. § 19.9 (1998) (Board is directed to return to RO any case in which "further evidence or clarification of the evidence ... is essential for a proper appellate decision"); *Chisem v. Brown,* 4 Vet.App. 169, 175 (1993); *Littke,* 1 Vet.App. at 93.

■■ The Board is required to include in its decision a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable an appellant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Allday v. Brown,* 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski,* 1 Vet.App. 49, 56–57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the veteran. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604, 1996 WL 56489 (Fed.Cir.1996) (table); *Gabrielson v. Brown,* 7 Vet.App. 36, 39–40 (1994); *Gilbert, supra.*

*a. Inadequacy of VA Medical Examination:* The appellant asserts that, until the May 1997 BVA decision here on appeal, the veteran's Pott's disease had consistently been rated under DC 5286 since 1975. Appellant's Br. at 10. The Secretary concedes that the Board overlooked the fact that the appellant had been assigned his 60% rating under DC 5286 and that the Board in its March 1996 remand of the rating-increase claim had directed the RO to evaluate the Pott's disease under DC 5286. Secretary's Br. at 7. Likewise, there is no disagreement that the possibly applicable schedular-rating diagnostic codes include 38 C.F.R. § 4.71a, DC 5001, 5286, and 5289 (1998); those DCs, none of

which have been changed since the BVA decision was issued, provide:

5001 Bones and joints, tuberculosis of, active or inactive:
Active . . . . . . . . . . . . . . . . . . . . . . . . . 100%
Inactive: See §§ 4.88b and 4.89.

5286 Spine, complete bony fixation (ankylosis) of:
Unfavorable angle, with marked deformity and involvement of major joints (Marie–Strumpell type) or without other joint involvement (Bechterew type) . . . . . . 100%
Favorable angle . . . . . . . . . . . . . . . . . 60%

5289 Spine, ankylosis of, lumbar:
Unfavorable . . . . . . . . . . . . . . . . . . . . 50%
Favorable . . . . . . . . . . . . . . . . . . . . . 40%

38 C.F.R. § 4.71a, DC 5001, 5286, and 5289. A prefatory note to DC 5286 and 5289 provides:

> NOTE: Both under ankylosis and limited motion, ratings should not be assigned for more than one segment by reason of involvement of only the first or last vertebrae of an adjacent segment.

38 C.F.R. § 4.71a. The ratings for inactive nonpulmonary TB are provided by 38 C.F.R. § 4.89 (1998), as cross-referenced in DC 5001, and those ratings apply to the veteran because his entitlement to compensation for Pott's disease was in effect on August 19, 1968. *See* 38 C.F.R. § 4.89 (although pertinent statute was repealed, *see* Pub.L. No. 90–493, § 4, 82 Stat. 808, 809 (1968), that statute "still applies to the case of any veteran who on August 19, 1968, was receiving or entitled to receive compensation for tuberculosis"). The appellant contends that his Pott's disease has been intermittently active since 1950 (Br. at 7); however, the most recent evidence of active Pott's disease is in the February 1968 VA medical examination report (R. at 234), and his Pott's disease is thus noncompensable under 38 C.F.R. § 4.89 (providing 0% rating for TB inactive for more than 11 years).

 In regard to the inadequate VA medical examination reports in this case, the Court has held, subsequent to the BVA decision in this case, that a remand by the Board confers on a veteran the right to VA compliance with the terms of the remand order and imposes on the Secretary a concomitant duty to ensure compliance with those terms. *Stegall v. West,* 11 Vet.App. 268, 271 (1998); *see also Brewer v. West,* 11 Vet.App. 228, 233 (1998) (holding that new caselaw applies to all pending appeals). In this case, the Board remanded this claim in March 1996 for an adequate examination and evaluation of the evidence. R. at 174–75. The Board's specific instructions that the VA medical examination report include comments on the presence or absence of unfavorable ankylosis pursuant to DC 5286 and to resolve differences in opinion as to the severity of the Pott's disease (*ibid.*) were not initially complied with (*see* R. at 178–88). The August 1996 VA medical examination report neither commented on the presence or absence of unfavorable ankylosis nor discussed the differences in opinion as to the severity or location (thoracic and/or lumbar) of the Pott's disease (*see* R. at 178–79, 187–88) as mandated by the March 1996 BVA remand order (R. at 174–75). Rather, the examiner commented only on the veteran's kyphotic deformity at the thoracolumbar area and positive gibbus deformity of T12–L3 with limited flexion and fusion of the vertebrae involved, on the lack of progression of the gibbus deformity, and on the veteran's pain. R. at 178–79. Thus, the Board's reliance on that medical report was improper. *See Stegall, supra; see also* 38 C.F.R. § 19.9. Also, the Board did not provide an adequate statement of reasons or bases, as required by 38 U.S.C. § 7104(d)(1), for its determination that the appellant does not qualify for a rating in excess of the currently assigned 60%. *See Caluza, Gabrielson,* and *Gilbert,* all *supra.* Further, as discussed in part II.A.2.b., below, the subsequent medical opinion, from October 1996, that discussed those issues may have been tainted by violations of the *Thurber* fair-process doctrine. *Thurber v. Brown,* 5 Vet.App. 119, 122–24 (1993).

In addition, the Court notes that without an adequate medical examination report, resolving the differences in previous medical opinions as to the severity and location of the Pott's disease, it is premature for the Court

to consider the question whether DC 5286 or DC 5289 would be the more appropriate diagnostic code, even taking 38 C.F.R. § 4.7 into account. *See* 38 C.F.R. § 4.1 (1998) ("[f]or the application of this schedule, accurate and fully descriptive medical examinations are required"). That is a matter, however, to be addressed by the Board after a medical opinion is obtained on remand in connection with the process outlined below.

Moreover, in light of the objective medical evidence as to pain (R. at 28, 38–39, 80, 89–90, 107, 179, 135), which could cause functional impairment under DC 5286–5295, the Court will remand this claim for a new examination that adequately evaluates the functional impairment due to pain, followed by a decision that specifically addresses the pain issue, supported by an adequate statement of reasons or bases. *See* 38 C.F.R. § 4.40, 4.45 (1998); *DeLuca v. Brown,* 8 Vet.App. 202, 207–08 (1995); *see also Smallwood v. Brown,* 10 Vet.App. 93, 99 (1997); *Green,* 1 Vet.App. at 124 ("fulfillment of the statutory duty to assist ... includes the conduct of a thorough and contemporaneous medical examination, one which takes into account the records of the prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one"). Also, "in regard to cases affected by change of medical findings or diagnosis", VA agencies are charged with handling such cases "so as to produce the greatest degree of stability of disability evaluations consistent with the law and [VA] regulations", and the Secretary's regulation provides: "It is essential that the entire record of examinations and the medical-industrial history be reviewed to ascertain whether the recent examination is full and complete, including all special examinations indicated as a result of general examination and the entire case history." 38 C.F.R. § 3.344(a) (1998). On remand, the Board must ensure that this regulation is heeded.

**b. BVA Reliance on Medical Opinion Obtained by Tainted Process:** In its May 1997 decision on appeal, the Board stated:

The evidence shows that the veteran's Pott's disease, or tuberculosis, involves T12 to L3, that it is inactive, and that it has been inactive for many years[. ] It is not contended otherwise. The residual disability is complete limitation of motion of the lumbar spine. The veteran is currently receiving more than the maximum schedular evaluation under Code 5289 for ankylosis of the lumbar spine. A rating cannot be assigned for the thoracic spine, since only T12, the last vertebra of the thoracic spine is involved. The most recent examiner has determined that Code 5286 is not applicable to the veteran's Pott's disease, and, even without the doctor's opinion, Code 5286, by its own terms, applies to ankylosis of the entire spine, and only a rating for the lumbar spine can be assigned for the veteran's Pott's disease.

R. at 6–7.

The Court notes that, in reaching the above conclusion, the Board relied on the October 1996 orthopedic medical opinion by the VA specialist that was solicited by the RO. R. at 6–7. Although the Board also said that "even without the doctor's opinion" it had concluded that DC 5286 applied only to conditions that affect "the entire spine", the Board was obviously influenced by the conclusion in the October 1996 medical opinion by the specialist that DC 5286 was not applicable to Pott's disease, even if the entire spine had been involved (R. at 191). The RO, in its October 1996 engagement memorandum that led to the October 1996 opinion, alleged that Dr. Lloren's October 1994 diagnosis as to the veteran's back disability was "lifted verbatim from the Rating Schedule", sought a resolution to that "problem", and then proposed that the specialist "feel free to refute the private physician's report as fully as possible for a better argument." R. at 255. That language suggested and, in effect, requested that the orthopedic specialist refute Dr. Lloren's opinion that the veteran's condition was ratable under DC 5286. In addition, the RO limited the inquiry to two narrow issues—whether the previous report was accurate and whether the veteran's disability had recently worsened—and left to the specialist's discretion whether he would

review certain prior examination and x-ray reports ("[y]ou might want to review the 1973 examination and x-rays", R. at 255).

The Court holds that the questions that the RO presented to that orthopedic specialist in the engagement memorandum were fatally flawed in that a "question may not suggest an answer or limit the field of inquiry by the expert." *Bielby v. Brown*, 7 Vet. App. 260, 268–69 (1994); *see also Austin v. Brown*, 6 Vet.App. 547, 552 (1994). The Secretary has conceded the impropriety of that memorandum. Under 38 C.F.R. § 4.23 (1998), "rating officers must not allow their personal feelings to intrude ... [and f]airness and courtesy must at all times be shown to applicants". That regulation was violated by the engagement memorandum prepared here. Moreover, the memorandum also violated a requirement in 38 C.F.R. § 4.1 ("[i]t is thus *essential*, both in the examination and in the evaluation of disability, that each disability be reviewed in relation to its history" (emphasis added)), because it gave the examiner discretion as to whether to review certain prior medical records. *See Green (Victor), supra* ("thorough and contemporaneous medical examination" is one that "takes into account the records of the prior medical treatment, so that the evaluation of the claimed disability will be a fully informed one").

Accordingly, in view of the errors pointed out in part II.A.2.a., above, and the serious compromise to the fairness of the adjudication process and in order that the adjudication of this claim comport with "underlying concepts of procedural regularity and basic fair play", *Thurber*, 5 Vet.App. at 123 (quoting *Gonzales v. United States*, 348 U.S. 407, 411–12, 75 S.Ct. 409, 99 L.Ed. 467 (1955)), a new medical opinion must be obtained on remand to carry out the Board's March 1996 remand order (R. at 174–75). *See Stegall, supra*. Accordingly, the Court will remand the claim *for the Board* to obtain a "medical opinion from the Chief Medical Director or an independent medical expert [ (IME) ], pursuant to 38 C.F.R. § 20.901(a),(d) (199[8] )," as part of the readjudication of the

Pott's disease claim that we hold is required. *Quiamco v. Brown*, 6 Vet.App. 304, 310 (1994); *see Lathan v. Brown*, 7 Vet.App. 359, 367 (1995) (holding that remand was "necessary for VA to obtain a medical opinion which [would] enable it to give [the claim] 'careful consideration', as required by 38 C.F.R. § 3.312(c)"); *see also* 38 U.S.C. §§ 5107(a), 7109; *Bielby*, 7 Vet.App. at 269 (requiring that BVA obtain IME opinion from an IME different from one whose opinion was tainted by Board's engagement letter). As to the process for obtaining the medical opinion on remand, although the Court is reluctant to intrude into the VA adjudication process, given the seriousness of the regulatory and fair-process violations that occurred in this case and the need for expeditious action in light of the nature of the 79–year–old veteran's disabilities and in order to ensure fairness, before any engagement letter is sent, the Court believes that the appellant's counsel should have an opportunity to submit a draft of such letter to the Secretary's representative here in Washington, D.C., and that the engagement letter should be prepared through that representative, in consultation with the appellant's counsel, for the Board then to send pursuant to 38 U.S.C. § 7109 and 38 C.F.R. § 20.901(d), rather than using the indirect approach of preparing an engagement letter in Washington, D.C., for use by the Philippines RO.

The appellant requested that the October 1996 RO letter and the October 1996 VA medical report not be included in the medical records provided to the Chief Medical Director, IME, or any examining physician engaged on remand. The Court is sympathetic to the appellant's concern that the adjudication process be fair and be seen as fair. *See* 38 C.F.R. § 4.23; *Hodge v. West*, 155 F.3d 1356, 1363 (Fed.Cir.1998) (declaring that because veteran's benefits "system of awarding compensation is so uniquely pro-claimant, the importance of systemic fairness and the appearance of fairness carries great weight"). However, as the Secretary stressed at oral argument, regardless of the taint in the en-

gagement memorandum, the opinion it produced contained a substantial amount of information favorable to the appellant, some of which the appellant cites in his brief in support of his claim. Moreover, the Court is confident that the medical opinion and examination obtained on remand in accordance with the process described above, in order to consider whether the veteran's schedular rating should be increased above 60%, will be carried out in a fully professional manner, uninfluenced by the regrettable comments of the RO. Hence, the Court rejects the appellant's request to exclude the October 1996 VA medical opinion from the remand proceedings. *Cf. Boutwell v. West,* 11 Vet.App. 387, 392–93 (1998) (concluding that Board's not removing from appellant's claims file a Board Medical Advisory Opinion that Board was precluded from considering in its adjudication does not violate fair process and that: "An IME is completely independent from the Board, and it is presumed that the expert is not influenced by the Board's opinion or belief.").

The appellant also raises a serious matter regarding the fairness of an unnamed individual or individuals in the RO in view of the biased and defective October 1996 RO engagement memorandum, and he requests adjudication in another VA office. The Secretary has the authority to direct that that be done. The Court is confident that, as counsel for the Secretary pledged at oral argument, the Secretary will take steps, in light of the § 4.23 violation, to ensure that this case will be fairly adjudicated and that any taint will be purged if and when it is remanded by the Board.

Finally, the Court holds that the Board's conclusion that DC 5286 is not applicable to a lumbar-spine disability is unsupported by any analysis or citation to authority. Thus, this determination violates the requirements of 38 U.S.C. § 7104(d)(1) that the Board include in its decision a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record. *See Allday* and *Gilbert,* both *supra; see also* 38 C.F.R.

§ 20.901(c) (1998) (BVA may obtain opinion from VA General Counsel on legal questions involved in case).

■■■■ *2. Extraschedular Rating for Pott's Disease.* The appellant also contends that the Board failed to provide an adequate statement of reasons or bases as to the issue of entitlement to an extraschedular rating under 38 C.F.R. § 3.321(b)(1) for his 60% rating for Pott's disease. Br. at 14. The Secretary argues that the circumstances of this case are not "exceptional or unusual" and thus do not warrant an assignment of an extraschedular rating. Br. at 7, n. 3. Section 3.321(b)(1) provides the following as to the exceptional case where schedular ratings are inadequate:

> To accord justice ... to the exceptional case where the schedular evaluations are found to be inadequate, the Chief Benefits Director or the Director, Compensation and Pension Service [at VA Central Office (VACO) ], upon field station submission, is authorized to approve on the basis of the criteria set forth in this paragraph an extra-schedular evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected disability or disabilities. The governing norm in these exceptional cases is: A finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards.

38 C.F.R. § 3.321(b)(1). Where there is evidence in the record that shows exceptional or unusual circumstances or where the veteran has asserted that a schedular rating is inadequate, the Board must specifically adjudicate the issue of whether an extraschedular-rating analysis is appropriate and, if there is enough such evidence, the Board must direct that the matter be referred to the VACO for consideration. *See Shipwash,* 8 Vet.App. at 224; *Fisher (Raymond),* 4 Vet.App. at 60; *see also* 38 U.S.C. § 7104(c) (precedent opinions

of VA General Counsel binding on BVA); 38 C.F.R. §§ 14.509, 19.5, 20.101(a) (1998) (same); *Bagwell,* 9 Vet.App. at 338–39; VA G.C. Prec. 6–96 (Aug. 16, 1996) (requiring referral to VACO for consideration of extraschedular rating when claimant asserts that schedular rating is inadequate). Under those circumstances, if the case is not referred to the RO for referral to the VACO for consideration of an extraschedular rating evaluation, the Board must provide an adequate statement of reasons or bases for its decision not to so refer it. *See Bagwell,* 9 Vet.App. at 339; *Shipwash,* 8 Vet.App. at 224. "The statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court." *Allday,* 7 Vet.App. at 527.

■ The BVA decision stated as follows in declining to consider an extraschedular rating:

> [I]t does not appear from the evidence that the RO has considered the issue of entitlement to an extraschedular rating under 38 C.F.R. § 3.321(b)(1) for the service-connected disability on appeal. The Board is required to address the issue of entitlement to an extraschedular rating under 38 C.F.R. § 3.321 only in cases where the issue is expressly raised by the claimant or the record before the Board contains evidence of "exceptional or unusual" circumstances indicating that the rating schedule may be inadequate to compensate for the average impairment of earning capacity due to the disability. In this case, consideration of an extraschedular rating has not been expressly raised [by the veteran]. Further, the record before the Board does not contain evidence of "exceptional or unusual" circumstances that would preclude the use of the regular rating schedule.

R. at 7 (citation omitted). As illustrated above, the Board failed to discuss the evidence of record including Dr. Lloren's conclusion that the veteran was not capable of manual labor, his diagnosis of total disability, and the appellant's illiteracy and unemployment history, which together are enough to support consideration of the need for an extraschedular rating. *See Fisher, supra.* Hence, on remand the Board is required to address an extraschedular rating for the veteran's service-connected Pott's disease if it is not rated 100% as a schedular matter.

3. *TDIU Rating Claim.* A TDIU rating is authorized "where the schedular rating is less than total." 38 C.F.R. § 4.16(a); *see Holland,* 6 Vet.App. at 446 (100% schedular rating "means that a veteran is totally disabled"). Because we cannot, at this time, definitively conclude that the appellant will be awarded a 100% schedular or extraschedular rating on remand, we thus proceed to consider the TDIU rating claim. Further, albeit in a somewhat different context, the Court has concluded that schedular and extraschedular rating-increase claims are not necessarily "inextricably intertwined" with TDIU rating claims predicated on the same condition. *See Vettese v. Brown,* 7 Vet.App. 31, 34 (1994) (holding that TDIU and schedular-rating-increase claims are not necessarily intertwined and that TDIU rating claim there was "subsequent, separate, and distinct" from schedular-rating-increase claim); *Holland, supra* (holding that rating-increase claim is not necessarily "inextricably intertwined" with a TDIU rating claim predicated on same condition); *Kellar v. Brown,* 6 Vet. App. 157, 162 (1994) (holding that, because extraschedular rating and TDIU ratings are measured differently, those claims were not inextricably intertwined). Indeed, the Secretary's counsel conceded at oral argument that the veteran's TDIU rating claim was a matter separate from the adjudication of his schedular or extraschedular rating claims and also that even if a TDIU rating is awarded, the veteran is still entitled to fair adjudication of those other claims. Hence, even though, for the reasons stated below, we will reverse the Board's denial of the TDIU claim, the two claims discussed previously are still viable. *See Beaty v. Brown,* 6 Vet. App. 532, 539 (1994).

The appellant argues that the Board failed to provide an adequate statement of reasons or bases for its determination, that there is

no plausible basis in the record to support the Board's denial of a TDIU rating, and that that denial is thus clearly erroneous. Appellant's Br. at 16–18. He also asserts, citing *Beaty*, 6 Vet.App. at 536, that, because the record contains no contradictory evidence to rebut the medical evidence that supports a TDIU rating, the Court should reverse the Board's denial and remand for the Board to award TDIU. Br. at 18.

The Secretary concedes that the Board erred in its analysis. Secretary's Br. at 12–14. Specifically, the Secretary concedes that the Board failed to support its conclusion that the veteran was employable (because he was capable of "lighter manual labor") with any medical evidence of record and, in fact, reached that conclusion by making inappropriate inferences from VA medical evidence. Br. at 12–13. He also recognizes that the Board ignored the veteran's statements as to his inability to work and provided an inadequate analysis of whether the medical evidence of unemployability was based only on the veteran's service-connected disabilities. Br. at 12. He also concedes that the Board failed to apply the appropriate definition of "substantially gainful employment" pursuant to VA's Adjudication Procedure Manual M21–1 (Manual M21–1), Part VI, ¶ 7.09a(7). Br. at 11, 13–14. The Secretary further concedes that the Board erred in relying on the facts that it had denied the veteran's TDIU claim in 1978 and that the veteran's combined rating had not changed in the intervening 19 years; the Secretary acknowledges that a TDIU rating "may not be denied merely because the schedular rating of the underlying disabilities remained the same." Br. at 14. Based on those errors, the Secretary requests a remand for an adequate medical examination and readjudication of this claim. Br. at 14. The appellant responds, reiterating his request for a reversal. Reply at 4–5. The Court agrees with the appellant as to the remedy for the conceded errors.

The Secretary is authorized to grant a TDIU rating pursuant to 38 C.F.R. § 4.16(a), which provides:

(a) Total disability ratings for compensation may be assigned, where the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities: *Provided* That, if there is only one such disability, this disability shall be ratable at 60 percent or more, and that, if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more. For the above purpose of one 60 percent disability, or one 40 percent disability in combination, the following will be considered as one disability: ... multiple injuries incurred in action....

38 C.F.R. § 4.16(a); *see Holland*, 6 Vet.App. at 446.

A TDIU claim is a new claim, subject to the requirement that it be well grounded, without the requirement that there be new and material evidence presented since the time that a TDIU rating was previously denied. *See Suttmann*, 5 Vet. App. at 138. A § 4.16(a) TDIU claim is generally well grounded under 38 U.S.C. § 5107(a) when a claimant's current service-connected disabilities meet the rating-level requirements of § 4.16(a) and there is evidence that he is "unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." *See* 38 C.F.R. § 4.16(a); *Norris*, 12 Vet.App. at 419–20; *Anderson v. Brown*, 5 Vet.App. 347, 353–54 (1993). The Court thus holds on de novo review that the veteran's TDIU claim was well grounded because his combined rating for his three combat-incurred, service-connected disabilities was 60% (R. at 8, 20, 113), Dr. Lloren had found that the veteran was incapable of manual labor and later concluded that he was totally disabled due to his three service-connected disabilities, and the veteran reported repeatedly that he could not work (R. at 28, 107). *See Norris* and *Anderson*, both *supra.*

Moving to the merits, because the veteran has met (R. at 8, 20, 113) the

rating-percentage requirements of § 4.16(a), *see Norris* and *Holland,* both *supra,* the issue under § 4.16(a) is whether "the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities". 38 C.F.R. § 4.16(a). The assignment of a rating is a factual determination, *see Arms,* 12 Vet.App. at 200, which the Court reviews under a "clearly erroneous" standard of review pursuant to 38 U.S.C. § 7261(a)(4); "if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... [the Court] cannot overturn them". *Gilbert,* 1 Vet.App. at 53; *see Lovelace v. Derwinski,* 1 Vet.App. 73, 74 (1990). Moreover, where the Board's determination does not have a plausible basis in the record, and is thus clearly erroneous, and all of the evidence of record supports the veteran's claim, the Court will reverse the Board's determination and remand for the Board to grant that claim. *See Beaty,* 6 Vet.App. at 538–39.

■ In *Beaty,* in reversing a BVA denial of a TDIU rating, the Court concluded that the Board had made findings of fact that had no evidentiary basis in the record; the Court held: "Where the veteran submits a well-grounded claim for a TDIU rating, as he has done here, the BVA may not reject that claim without producing evidence, as distinguished from mere conjecture, [that] the veteran can perform work that would produce sufficient income to be other than marginal." *Id.* at 537. After determining, based on Manual M21–1, Part VI, ¶ 7.55b(7), that substantially gainful employment suggested "a living wage", the Court noted in *Beaty* that the Board had failed to apply that Manual provision and stated:

Here, the record showed that the veteran had an eighth-grade education, that he had been a farmer for the past thirty to forty years and that was the "only occupation" he knew, that he had been unemployed since 1989, and that he had made repeated, unsuccessful efforts to obtain non-farming employment. R. at 63, 66, 84, 96. The medical evidence showed that the

veteran had been advised to "retire" because of his service-connected disabilities. R. at 36, 98. Yet the Board implicitly reached a medical conclusion that he was able to perform "sedentary work" (R. at 7), a finding which the Court also holds had no plausible basis in the record. *See* 38 U.S.C. § 7261(a)(4); *Harder v. Brown,* 5 Vet.App. 183, 189 (1993). There is no evidence of record to show that the veteran could *"realistically* [,] within [his] physical and mental capabilities", pursue the type of employment that would enable him to earn a living wage. *Moore* [*(Robert) v. Derwinski* ], 1 Vet.App. [356,] 359 [ (1991) ] (citing *Timmerman v. Weinberger,* 510 F.2d 439, 442 (8th Cir.1975)); Manual, pt. VI, para. 7.55b(7). Moreover, there is no evidence of record to support the Board's implicit conclusion that any job that the veteran might be capable of obtaining and retaining would provide more than "marginal employment" as defined in 38 C.F.R. § 4.16(a).

*Beaty,* 6 Vet.App. at 538.

In its May 1997 BVA decision, the Board concluded in the instant case:

The record does not support the claims that the veteran's service-connected disabilities have worsened since the April 1978 Board decision denying entitlement to a total rating based on [individual] unemployability. In addition[,] when the veteran's advancing age is not taken into consideration, his back disorder and other service-connected disabilities, although they may preclude strenuous manual labor, do not preclude lighter manual labor with which the veteran is experienced. The 1994 examiner found that certain activities were limited for the veteran; the examiner did not find that such activities were precluded. The private physician who opined that the veteran is totally disabled clearly, as evidenced by the physician's statements, considered non[-]service-connected disabilities.

R. at 12.

The preceding Board analysis contains three errors, all of which are essentially con-

ceded by the Secretary. First, contrary to the Board's reliance on the idea that because the evidence did not establish a worsening of the appellant's service-connected disabilities a TDIU rating was not warranted, the issue here is not whether there has been a worsening (it is a new claim, *see Suttmann, supra* ) but whether "the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities", 38 C.F.R. § 4.16(a). Therefore, the Board applied an incorrect standard to the veteran's claim. Second, there is no evidence in the record to support the Board's conclusions that the veteran's three service-connected disabilities—Pott's disease, left-leg gunshot wound, and chest scar—"[did] not preclude lighter manual labor with which the veteran is experienced" and that "the examiner did not find that such activities were precluded" (R. at 10). In fact, in the only employment-related evidence of record, Dr. Lloren specifically concluded, based on his findings and diagnoses *as to the veteran's three service-connected disabilities*, that the veteran was totally disabled (R. at 107) and at least twice opined that he was unable to do any "manual labor or employment" (R. at 28, 107; *see also* R. at 135). Although several VA medical examiners failed to discuss their findings in relation to the veteran's employability (despite the regulatory requirement that they do so, *see* 38 C.F.R. § 4.10 (1998) (basis of disability evaluations is how body and mind functions "under the ordinary conditions including employment" and medical examiner is obliged to provide full description of effects of disability and to focus on effect of disability on "engag[ing] in employment")), the record contains significant evidence of physical impairment, including: (1) The VA physician's July 1993 diagnosis of the veteran as having Pott's disease with kyphosis and "complete limitation of motion" (R. at 39); (2) the VA examiner's September 1994 opinion that the veteran's deformity limited "his ability to engage in activities that require movement of his trunk—bending, carrying objects, prolonged walking" (R. at 90); and (3) the VA orthopedic specialist's October 1996 finding that the veteran had a fixed kyphotic deformity, positive gibbus deformity with a prominent back spine, fixed forward flexion, no rotation to either side, minimal backward extension and lateral flexion, and fused vertebrae (R. at 178–79). Moreover, the veteran had repeatedly stated that he was unable to work due to his service-connected disabilities. R. at 66, 106, 123.

Third, the Board's statement that, in determining that the veteran was totally disabled, Dr. Lloren considered non-service-connected disabilities is likewise unsubstantiated by the record. Dr. Lloren discussed the disabilities of the veteran to his back, left-leg, and chest and did not mention any non-service-connected conditions, such as the spinal arthritis. *See* R. at 28, 107, 135. The only competent evidence of record as to the veteran's ability "to secure or follow a substantially gainful occupation" consists of Dr. Lloren's three medical opinions, all of which support the conclusion that the veteran is not capable of such because of his three service-connected disabilities. *See* R. at 28, 107, 135. The facts of this case are analogous to those of *Beaty;* here, the appellant is illiterate (R. at 23, 225, 227), has been employed at unskilled manual labor and driving vehicles, has apparently been unemployed since at least March 1993 (R. at 28) and maybe even 1965 (R. at 19), and can no longer qualify for a driver's licence (R. at 135), and the medical evidence establishes that his back condition does not allow him to do the basic tasks of manual labor that he has always had to do to support himself, given his lack of education and training (R. at 28, 90, 107, 135). Because the veteran meets the § 4.16(a) schedular-rating-percentage requirements, because the Board incorrectly applied § 4.16(a), because there was no plausible basis in the record for its denial of the claim, and because the only evidence of record supports the appellant's claim, the Court will reverse the Board's denial of the TDIU claim and remand that claim to the Board for the assignment of a TDIU rating. *See Beaty, supra.*

### *B. Service–Connection Claim for Arthritis as Secondary to Pott's Disease*

The appellant contends that he reasonably raised to the Board a claim for service con-

nection for arthritis as secondary to his Pott's disease and that the Board erred in failing to include the veteran's spinal arthritis as part of his Pott's disease schedular-rating-increase claim. Brief at 7–9, 9–12; Reply at 5–7. The Secretary argues that the appellant raised to the Board the arthritis issue only in order to qualify his back condition for a rating under DC 5286, which requires the involvement of the entire spine, and that the appellant raises the secondary connection claim for the first time to this Court; thus, the Secretary argues, the Court has no jurisdiction to consider such secondary-service-connection claim. Brief at 15–17. Although the veteran mentioned the July 1993 VA diagnosis of sacroiliac arthritis, we hold that the record provides no evidence of the veteran's having filed either a formal or an informal claim. *See* 38 U.S.C. § 5101(a) or 38 C.F.R. § 3.155 (1998); *Brannon v. West,* 12 Vet.App. 32, 34–35 (1998); *see also Jones v. West,* 136 F.3d 1296, 1299 (Fed.Cir.1998). Nor is there evidence of an NOD conferring jurisdiction on this Court as to an RO's determination on or failure to adjudicate this matter. *See* Veterans' Judicial Review Act, Pub.L. No. 100–687 § 402, 102 Stat. 4105, 4122 (1988) (found at 38 U.S.C. § 7251 note); *Hazan v. Gober,* 10 Vet.App. 511, 516–17 (1997); *Isenbart v. Brown,* 7 Vet.App. 537, 540 (1995); *Hamilton (Stanley) v. Brown,* 4 Vet.App. 528, 531–32 (1993) (en banc), *aff'd,* 39 F.3d 1574 (1994). Thus, we will not consider that matter. *See Arms,* 12 Vet.App. at 193.

### III. Conclusion

Upon consideration of the foregoing analysis, the record on appeal, the briefs of the parties, and oral argument, the Court reverses the May 22, 1997, BVA decision as to the TDIU claim and remands that matter for the Board to award that rating. *See Bielby, supra.* Upon further such consideration, the Court vacates the 1997 BVA decision as to the rating-increase claim for the veteran's Pott's disease and remands that matter for expeditious further development and issuance of a readjudicated decision supported by an adequate statement of reasons or bases,

*see* 38 U.S.C. §§ 1110, 5107, 7104(a), (d)(1); 38 C.F.R. §§ 3.321(b), 3.344(a), 4.1, 4.2, 4.7, 4.10, 4.23, 4.25, 4.40, 4.45, 4.71a, DC 5286, 19.9, 20.901(c), (d); *Fletcher v. Derwinski,* 1 Vet.App. 394, 397 (1991)—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or the Court). *See Allday,* 7 Vet.App. at 533–34. The Secretary's motion is denied. On remand, the appellant will be free to submit additional evidence and argument on the remanded claim in accordance with *Kutscherousky v. West,* 12 Vet.App. 369, 372 (1999) (per curiam order). The Court notes that a remand by this Court and by the Board confers on an appellant the right to VA compliance with the terms of the remand order and imposes on the Secretary a concomitant duty to ensure compliance with those terms. *See Stegall,* 11 Vet.App. at 271. A final decision by the Board following the remand herein ordered will constitute a new decision that, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant. *See Marsh v. West,* 11 Vet.App. 468, 472 (1998).

The Court expresses its particular gratitude to the appellant's pro bono counsel who submitted briefs and presented oral argument in this case. His contributions have been of great value to the Court, as have those of counsel for the Secretary.

REVERSED IN PART AND VACATED IN PART AND REMANDED.