Citation Nr: 1749178 
Decision Date: 10/31/17 Archive Date: 11/06/17

DOCKET NO. 09-18 816 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Medical and Regional Office Center in Wichita, Kansas


THE ISSUES

1. Entitlement to an initial disability rating in excess of 10 percent for service-connected degenerative disc disease of the cervical spine (cervical spine disability), prior to June 26, 2008, and greater than 30 percent from January 1, 2009 (a temporary 100 percent disability rating was assigned from June 26, 2008, to December 31, 2008, based on surgical or other treatment necessitating convalescence).

2. Entitlement to an initial disability rating in excess of 20 percent for service-connected left upper extremity radiculopathy.

3. Entitlement to initial disability rating in excess of 20 percent for service-connected right upper extremity radiculopathy.

4. Entitlement to a total rating based upon individual unemployability due to service-connected disabilities (TDIU).



REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

Appellant and his spouse


ATTORNEY FOR THE BOARD

D. J. Drucker, Counsel


INTRODUCTION

The Veteran had active service from July 1968 to July 1972.

This matter comes before the Board of Veterans' Appeals on appeal from a January 2008 rating decision of the Department of Veterans Affairs (VA), Regional Office (RO), in Wichita, Kansas, that granted service connection for degenerative disc disease of the cervical spine that was assigned an initial 10 percent disability rating from January 3, 2007, and that denied service connection for a low back disorder.

A December 2008 rating decision granted a temporary 100 percent disability rating from June 26 to December 31, 2008, based on the Veteran's surgery for C4-6 anterior cervical diskectomy and fusion. A June 2009 rating decision assigned a 30 percent disability rating for the cervical spine disability from January 1, 2009.

In October 2010, the Veteran and his wife testified during a hearing at the RO before the undersigned Acting Veterans Law Judge. A transcript of the hearing is of record.
In March 2011, the Board remanded the Veteran's case to the Agency of Original Jurisdiction (AOJ) for further development. At that time, the Board noted that, during his October 2010 Board hearing, the Veteran stated that he could not work due to his back disability and that a TDIU claim was part of an increased disability rating claim when such claim was raised by the record. See Rice v. Shinseki, 22 Vet. App. 447 (2009). The Board remanded the matter of entitlement to a TDIU for AOJ consideration with the Veteran's increased rating claim.

In August 2014, the Board remanded the Veteran's case to the AOJ for further development.

A November 2016 rating decision granted service connection for lumbar spine degenerative joint disease and degenerative disc disease, that represents a full grant of the benefits sought as to the Veteran's service connection for a low back disorder. That decision also granted service connection for left and right upper extremity radiculopathy, that were assigned initial 20 percent disability ratings from May 6, 2015. The initial ratings for the Veteran's upper extremity radiculopathy are part and parcel of his claim for an increased initial rating for his cervical spine disability and are, thus, properly before the Board. See 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (1) (2016).

The issue of entitlement to service connection for depression as due to service-connected cervical spine and bilateral upper extremity radiculopathy disabilities has been raised by the record in a May 2008 statement, but has not been adjudicated by the AOJ. See 5/28/08 VBMS Correspondence. Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2016).

The Veteran's claims file has been converted into a paperless claims file via the Virtual VA and Veterans Benefits Management System (VBMS) paperless claims processing systems. All records in such files have been considered by the Board in adjudicating this matter. 


FINDINGS OF FACT

1. Prior to June 26, 2008, the orthopedic manifestations of the Veteran's cervical spine disability consisted of forward flexion limited to 40 degrees, extension to 45 degrees, left lateral flexion to 26 degrees, right lateral flexion to 22 degrees, left lateral rotation to 54 degrees and right lateral rotation to 66 degrees, and flare-ups of constant and severe pain, that produced even greater functional limitation.

2. Since January 1, 2009, the orthopedic manifestations of the Veteran's cervical spine disability have been manifested by complaints of pain and stiffness, without unfavorable ankylosis of the entire cervical spine, and with flare-ups of pain that did not produce greater functional limitations and no incapacitating episodes.

3. Since January 3, 2007, the Veteran's left upper extremity radiculopathy has been manifested by absent reflexes or diminished reflexes and sensory symptoms essentially commensurate with mild incomplete paralysis of the minor upper extremity.

4. Since January 3, 2007, the Veteran's right upper extremity radiculopathy has been manifested by absent reflexes or diminished reflexes and sensory symptoms essentially commensurate with mild incomplete paralysis of the major upper extremity.

5. The Veteran's service-connected disabilities have precluded gainful employment throughout the appeal period.


CONCLUSIONS OF LAW

1. Prior to June 26, 2008, and since January 3, 2007, resolving the doubt in the Veteran's favor, the criteria for an initial 20 percent disability rating, but not higher, for service-connected cervical spine disability are met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.71a, Diagnostic Codes 5237-5243 (2016). 

2. Since January 1, 2009, the criteria for a disability rating in excess of 30 percent for service-connected cervical spine disability are not met. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.71a, Diagnostic Codes 5237-5243.

3. Since January 3, 2007, the criteria for an initial 20 percent disability rating, but not higher, for service-connected left upper extremity radiculopathy have been met. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.124a, Diagnostic Code 8513 (2016).

4. Since January 3, 2007, the criteria for an initial 20 percent disability rating, but not higher, for service-connected right upper extremity radiculopathy have been met. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.124a, Diagnostic Code 8513.

5. The criteria for the award of a TDIU have been met. 38 U.S.C.A. §§ 1155, 5110 (West 2014); 38 C.F.R. §§ 3.400, 3.341(a), 4.16, 4.19, 4.26 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

VA's Duties to Notify and Assist

The appeal as to the Veteran's claim regarding his cervical spine disability arises from disagreement with the initial rating following the grant of service connection. Once service connection is granted the claim is substantiated, additional notice regarding VA's duty to assist him in the development of his claim is not required; and any defect in the notice is not prejudicial. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007).

VA has done everything reasonably possible to assist the Veteran with respect to his claims for benefits in accordance with 38 U.S.C.A. § 5103A and 38 C.F.R.§ 3.159 (c). His service treatment records were obtained. All reasonably identified and available VA and non-VA medical records have been secured, including records considered by the Social Security Administration (SSA) in its determination that the Veteran was unable to work and eligible for benefits since March 31, 2008 primarily due to cervical spine disability and, secondarily, to chronic heart failure. See 6/18/10 VBMS Medical Treatment Records-Furnished by SSA, page 3.

The Veteran underwent VA examinations November 2007, May 2009, and March 2011, and the examination reports are of record.

The Board's August 2014 remand was to schedule the Veteran for a VA examination of his spine and obtain medical records from the Topeka VA Medical Center (VAMC) since December 2006, and records of chiropractic treatment by Dr. M. There has been substantial compliance with this remand, as he was scheduled for a VA examination in May 2015, and Topeka VAMC records, dated to September 2014, were obtained. The Veteran did not respond to the AOJ's October 2014 letter to provide authorization for VA to obtain Dr. M.'s records.

The May 2015 VA examination report makes up for the deficiencies in the earlier reports, thus the Board ensured that its remand directives were completed.

There is no indication that the Veteran's claimed cervical spine disability has worsened since the last related VA examination. As such, the Board finds that there is no basis to obtain a more current examination in this case. See Palczewski v. Nicholson, 21 Vet. App. 174, 181-83 (2007) (stating that the mere passage of time not a basis for requiring of new examination).

There is no evidence or argument that there is additional notice or assistance that would be reasonably likely to further substantiate the claims. As such, the Board finds the duties to notify and assist have been met.

Cervical Spine Disability

The Veteran asserts that his cervical spine pain caused him to miss work and eventually lose his job. See 3/28/08 VBMS VA 21-4138 Statement in Support of Claim; October 2010 Board hearing transcript, pages 4, 6; 5/19/09 VBMS Correspondence. His neck disability deteriorated since his surgery such that he was unable to do much of anything more than a few hours a day. See October 2010 Board hearing transcript, page 5. The Veteran was unable to turn his head while driving that caused several near accidents and fatigued easily. Id. He took painkillers and muscle relaxants in limited amounts due to the side effects. Id. at 6. The Veteran had sleep difficulty due to neck pain. Id. The Veteran used to play golf, bowl, and play baseball, but was no longer able to participate in those activities. Id. at 8. He had flare-ups of symptoms, when he was unable to do anything, every once in a while that occurred when he did too much activity and was fatigued. Id. at 9. The Veteran's wife noted that he was always in pain. Id.

Thus, the Veteran contends that a higher initial rating is warranted for his cervical spine disability.

Disability ratings are determined by the application of a schedule of ratings which is based, as far as can practically be determined, on the average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1 (2016). Each service-connected disability is rated on the basis of specific criteria identified by Diagnostic Codes. 38 C.F.R. § 4.27 (2016).

In order to evaluate the level of disability and any changes in condition, it is necessary to consider the complete medical history of the Veteran's condition. Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991). However, where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). 

Where the question for consideration is the propriety of the initial rating assigned, evaluation of the medical evidence since the effective date of the grant of service connection, and consideration of the appropriateness of "staged rating" (i.e., assignment of different ratings for distinct periods of time, based on the facts found) is required. Fenderson v. West, 12 Vet App 119, 125-26 (1999).

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise with the appellant prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 
Where there is a question as to which of two disability ratings is to be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2016).

In view of the number of atypical instances it is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances. 38 C.F.R. § 4.21 (2016). 

Competent medical evidence means evidence provided by a person who is qualified through education, training, or experience to offer medical diagnoses, statements, or opinions. Competent medical evidence may also mean statements conveying sound medical principles found in medical treatises. It also includes statements contained in authoritative writings, such as medical and scientific articles and research reports or analyses. 38 C.F.R. § 3.159 (a)(1) (2016). Competent lay evidence means any evidence not requiring that the proponent have specialized education, training, or experience. Lay evidence is competent if it is provided by a person who has knowledge of the facts or circumstances and conveys matters that can be observed and described by a lay person. 38 C.F.R. § 3.159 (a)(2).

The Veteran's statements describing the symptoms of his service-connected disabilities are deemed competent. These statements must be considered with the clinical evidence of record and in conjunction with the pertinent rating criteria. 

For disabilities rated on the basis of limitation of motion, VA is required to apply the provisions of 38 C.F.R. §§ 4.40, 4.45, pertaining to functional impairment. The United States Court of Appeals for Veterans Claims (Court) has instructed that in applying these regulations VA should obtain examinations in which the examiner determined whether the disability was manifested by weakened movement, excess fatigability, incoordination, or pain. Such inquiry is not to be limited to muscles or nerves. These determinations are, if feasible, be expressed in terms of the degree of additional range-of-motion loss due to any weakened movement, excess fatigability, incoordination, flare-ups, or pain. Mitchell v. Shinseki, 25 Vet App 32 (2011); DeLuca v. Brown, 8 Vet. App. 202 (1995). 

The "pain must affect some aspect of 'the normal working movements of the body' such as 'excursion, strength, speed, coordination, and endurance,'" as defined in 38 C.F.R. § 4.40, before a higher rating may be assigned. This is because "pain alone does not constitute a functional loss under the VA regulations that evaluate disability based upon range-of-motion loss." Mitchell, 25 Vet. App. at 33, 43.

VA's policy is treated actually painful, unstable, or malaligned joints as warranting at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. This regulation applies to any service-connected joint disability, not just arthritis. When § 4.59 is raised by the claimant or reasonably raised by the record, even in non-arthritis contexts, VA should address its applicability. Burton v. Shinseki, 25 Vet. App. 1 (2011). The Board is aware of the decision of Correia v. McDonald, 28 Vet. App. 158 (2016), in which the Court stated that the final sentence in 38 C.F.R. § 4.59 ("[t]he joints involved should be tested for pain on both active and passive motion, in weight-bearing and non-weightbearing and, if possible, with the range of the opposite undamaged joint") creates a requirement that certain range of motion testing be conducted whenever possible in cases of joint disabilities. In this case the VA examinations recorded active range of motion of the pertinent joints and corresponding active range of motion of the opposing joints; the examiners did not record pain with passive motion or with weightbearing. The Board finds no prejudice in this case because the Veteran has complained of joint pain with palpation but has never complained of pain with weightbearing versus nonweightbearing activities, and there is no evidence of record which suggests that passive motion of the joints in question would be worse than active, or that with weight-bearing for a higher rating.

Under the general rating formula for the spine, with or without symptoms such as pain, stiffness, or aching in the area of the spine affected by residuals of injury or disease, the following ratings apply: a 10 percent disability rating is warranted for forward flexion of the cervical spine greater than 30 degrees but not greater than 40 degrees; or the combined range of motion of the cervical spine greater than 170 degrees but not greater than 335 degrees; or muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Diagnostic Codes 5235 to 5243. 

A 20 percent disability rating is warranted for forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degrees; or the combined range of motion of the cervical spine not greater than 170 degrees; or muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. Id.

A 30 percent disability rating is warranted for forward flexion of the cervical spine to 15 degrees or less; or favorable ankylosis of the entire cervical spine. Id.

A 40 percent disability rating is warranted if the medical evidence shows unfavorable ankylosis of the entire cervical spine. Id. A 50 percent disability rating is warranted if there is unfavorable ankylosis of the entire thoracolumbar spine. Id. A 100 percent disability rating is warranted if there is unfavorable ankylosis of the entire spine. Id.

Ankylosis is defined in general as "immobility and consolidation of a joint due to disease, injury, or surgical procedure." See Colayong v. West, 12 Vet. App. 524, 528 (1999) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 86 (28th ed. 1994)); see also Note (5) to General Rating Formula for Diseases and Injuries of the Spine (stating that for VA compensation purposes, unfavorable ankylosis is a condition in which the entire cervical spine, the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension).

Any associated objective neurologic abnormalities, including, but not limited to bowel or bladder impairment are rated separately under an appropriate diagnostic code. Id., Note (1). 

Under Diagnostic Code 5243, Note 6 directs that intervertebral disc syndrome is to 
be rated under the General Rating Formula for Disease and Injuries of the Spine or under the formula for rating based on incapacitating episodes, whichever method results in the higher disability rating when all disabilities are combined under 38 C.F.R. § 4.25. A 10 percent disability rating is warranted with incapacitating episodes having a total duration of at least one week but less than two weeks during the past 12 months. A 20 percent disability rating is assigned with incapacitating episodes having a total duration of at least two weeks but less than four weeks during the past 12 months. With incapacitating episodes having a total duration of at least four weeks but less than six weeks during the past 12 months, a 40 disability rating is warranted. A 60 percent disability rating is assigned with incapacitating episodes having a total duration of at least six weeks during the past 12 months. Id. 

Note (1): An incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. "Chronic orthopedic and neurologic manifestations" means orthopedic and neurologic signs and symptoms resulting from intervertebral disc syndrome that are present constantly, or nearly so. 

Note (2): When evaluating on the basis of chronic manifestations, evaluate orthopedic disabilities using rating criteria for the most appropriate orthopedic diagnostic code or codes. Evaluate neurologic disabilities separately using rating criteria for the most appropriate neurologic diagnostic code or codes. 

Note (3): If intervertebral disc syndrome is present in more than one spinal segment, provided that the effects in each spinal segment are clearly distinct, evaluate each segment on the basis of chronic orthopedic and neurologic manifestations or incapacitating episodes, whichever method results in a higher disability rating for that segment. 

Normal forward flexion of the cervical segment of the spine is zero to 45 degrees, extension is zero to 45 degrees, left and right lateral flexion are zero to 45 degrees, and left and right lateral rotation are zero to 60 degrees. The combined range of motion refers to the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation. The normal combined range of motion of the cervical spine is 340 degrees. See Note 2, General Rating Formula for Disease and Injuries of the Spine. 38 C.F.R. § 4.71a , Plate V (2016).

The medical evidence shows the Veteran treated his cervical spine disability with private chiropractic treatment in September 2007. See 11/9/07 VBMS Medical Treatment Record Non Government Facility, page 19.

During the November 2007 VA examination, performed by a physician assistant, the Veteran complained of constant, severe neck pain that radiated to his right arm with flare-ups caused by overhead work that caused him to miss several days of work and lose jobs due to an inability to perform his duties. He had right-sided neck pain that was a dull ache, and a sharp pain that radiated to his right arm. The Veteran had flare-ups of pain that he rated a five out of 10 once or twice a month that lasted two or three days caused by overhead activity. He had difficulty driving and some difficulty dressing because he could not reach around his back to put on a belt. The Veteran worked as a maintenance man and was unable to use a grease gun in his right hand. He could not bowl or drive long distances.

Range of motion of the Veteran's cervical spine was forward flexion to 40 degrees, extension to 45 degrees, left lateral flexion to 26 degrees, right lateral flexion to 22 degrees, left lateral rotation to 54 degrees, and right lateral rotation to 66 degrees. The combined range of motion was 253 degrees. There was pain with motion and no additional loss of motion with repetitions. Neurological examination findings were within normal limits. Reflexes and sensory findings were intact. The examiner observed that the Veteran was slightly weak since he was right-hand dominant. The Veteran's right hand grip was approximately a 4/5 when compared to the left hand grip. X-rays showed cervical spondylosis with mild diffuse spinal canal stenosis and findings suggestive of degenerative disc disease of the cervical spine. The clinical diagnosis was degenerative disc disease and degenerative joint disease of the cervical spine.

During a February 2008 VA outpatient primary care evaluation, the Veteran reported neck pain and bilateral upper extremity and hand numbness. See 4/10/08 VBMS Medical Treatment Record Government Facility, page 27. Radiologic studies and ortho and neuro surgery evaluations were recommended by his physician.

A February 2008 magnetic resonance image (MRI) of the Veteran's cervical spine showed disc bulging at level of C5-C6 and, to lesser degree, C2 through C5. See 4/10/08 VBMS Medical Treatment Record Government Facility, page 9.

During a February 28, 2008 orthopedic surgery evaluation, the Veteran complained of neck pain that went posterolaterally to both sides and out to both shoulders, and pain down both arms, more to the right than the left. See 4/10/08 VBMS Medical Treatment Record Government Facility, page 26. His pain on the right side went all the way to thumb level. Both hands went numb, the left more so than the right, that occurred intermittently. These symptoms were present for about seven years. The Veteran worked at a maintenance job and had to miss some work because of these symptoms. He had some mild relief with chiropractic treatment.

Examination of the Veteran's neck showed limited extension with some increased symptoms of discomfort. The examiner reported that flexion was "pretty good without symptoms". Id. Right and left rotational motions, and tilts, were mildly limited. All these increased neck symptoms to some degree. Examination of the Veteran's arms shows no muscle atrophy and no particular weakness. Elbow extension and flexion strength was good. Wrist extension and flexion strength, grip strength, and thumb to fifth finger pinching bilaterally was good. Upper extremity reflexes were hypoactive and difficult to elicit. Sensation today was within normal limits throughout the hands and arms. The diagnosis was cervical spine degenerative disk disease at multiple levels with bilateral upper extremity radiculopathy. 

According to a March 14, 2008, primary care record, the Veteran was out of work for one week and feared he would be fired. See 4/10/08 VBMS Medical Treatment Record Government Facility, page 4. His job involved a lot of lifting and bending. It was noted that he was referred for orthopedic and neurosurgical evaluations and another physician reported that the Veteran's job involved frequent bending and stooping and lifting up to 50 pounds. Light duty was advised until his neurosurgical evaluation. The assessment was cervical pain with myelopathy.

A March 24, 2008 electromyography (EMG) showed mild left chronic C5-6 radiculopathy, and mild to moderate bilateral carpal tunnel syndrome. See 4/10/08 VBMS Medical Treatment Record Government Facility, pages 2-3.

An April 1, 2008 VA outpatient neurosurgery record reflects the Veteran's complaint of neck pain that radiated to his bilateral shoulders and arms to his hands. See 4/10/08 VBMS Medical Treatment Record Government Facility, page 1. He had bilateral hand numbness and tingling with symptoms worse on the right. The Veteran reported that he dropped things and had difficulty buttoning his shirt. He was unable to work for the past month because of these problems. His pain was so severe, particularly the constant numbness, that it affected his ability to sleep. The diagnosis was cervical spinal stenosis and surgery was suggested.

On June 26, 2008, the Veteran underwent a C5 corpectomy; C4-C6 anterior cervical arthrodesis with mesh titanium cage with local autograft and allograft; harvesting of autograft and C4-C6 anterior cervical internal fixation with lifespan internal fixation. See 8/11/08 VBMS Medical Treatment Record Government Facility, page 3.

A January 2009 MRI of the Veteran's cervical spine included an impression of cervicalgia with probable left cervical radiculopathy, degenerative disc disease of the cervical spine, and cervical spine stenosis. See 4/21/09 VBMS Medical Treatment Record Government Facility, page 1. 

The Veteran had a neurosurgery follow up on January 30, 2009. There were no new recommendations regarding his neck pain that seemed suggestive of depression. See 4/21/09 VBMS Medical Treatment Record Government Facility, page 15. The neurosurgeon reviewed the Veteran's computerized tomography (CT) myelogram that demonstrated "excellent progression of his fusion with good placement of the hardware and no recurrent stenosis." The physician observed that the Veteran's EMG was fairly inconclusive, and suggestive for being fairly normal, with no findings of acute radiculopathy.

In April 2009, the Veteran was referred for a physical medicine rehabilitation (PMR) examination for evaluation of left chronic neck "muscle" pain associated with intermittent radiation of pain to his right upper extremity and left shoulder since July 2008, after surgery for fusion of his C5-7 for spinal stenosis. See 4/21/09 VBMS Medical Treatment Record Government Facility, page 1. His pain was aggravated by sitting more than thirty minutes without head support/turning his head (he noted reduced rotation of the his head with increased pain), he had left hand numbness regularly with use, and his pain interfered with sleep.

The May 2009 VA examination report indicates that the Veteran reported more pain in his neck than before his surgery, with improvement of extremity symptoms, strength in his right arm, and some numbness that returned in his left arm. He had constant, daily mild to moderate neck pain, that he rated from one to six out of 10. The Veteran also had intermittent, shooting pain, and spasms in his right arm, and posterior shoulder and spasms in his triceps. He described his pain as a constant dull ache in the neck, sharper on movement, and intermittent shooting pain in his right posterior shoulder and arm. His pain was aggravated by using a computer for 30 to 60 minutes, turning his head, lifting greater than ten pounds, looking up, and driving.

The Veteran had flare-ups of moderate pain, that he rated six out of 10, four to five times a week that lasted 30 to 45 minutes and were caused by doing instrumental activities of daily living such as housework. During the flare-up, he was unable to turn his head. The Veteran also reported stiffness, fatigue, spasms, weakness, decreased motion, numbness and paresthesias intermittent numbness and tingling in his left arm.

The Veteran's cervical spine disability had no effects on his mobility or activities of daily living. He was laid off from his usual occupation as a maintenance truck driver, due to his neck problem, as he had difficulty with pain due to bouncing of the vehicle and pain on turning his head to observe traffic. While driving, the Veteran could not turn his head to observe traffic and had to rely on mirrors.

The examiner noted that the Veteran's spine was straight, and position of his head was neutral. There was loss of cervical lordosis curvature. His neck was symmetrical in appearance. On examination, range of cervical spine motion was forward flexion from zero to 15 degrees, extension from zero to 20 degrees, left lateral flexion from zero to 15 degrees, right lateral flexion from zero to 25 degrees, left lateral rotation from zero to 22 degrees, and right lateral rotation from zero to 26 degrees. The combined range of cervical spine motion was 123 degrees.

The examiner noted objective evidence of pain, and pain on motion and repetitive use. The Veteran had pain at end of bilateral lateral flexion and rotation and on extension. There was tenderness over the soft tissues of the right and left lateral musculature and upper trapezius muscles. There was no atrophy, spasm or weakness, no guarding, no postural or muscular abnormalities, and no fixed deformities. The Veteran had a well healed anterior surgical scar, horizontal linear and hypopigmented. It measured 10 centimeters by 3 millimeters. The scar was superficial, stable, smooth, flat with no adherence, tenderness, inflammation, induration, keloid formation or underlying tissue loss. The scar did not affect motion or function.

On neurological examination, sensory findings showed the Veteran had blunted sensation to light touch and pin prick over the median nerve (C6) distribution of the right hand. There was no atrophy, circumferential measurements were equal in the upper extremities, muscle bulk and tone were normal, as was strength (5/5). No pathologic reflexes were found.

Pain, fatigue, weakness, lack of endurance, and incoordination did not cause any additional loss of range of motion. There were no incapacitating episodes during the past twelve month period. The diagnosis was degenerative osteoarthritis and disc disease of the cervical spine. The Veteran had residual intermittent sensory neuropathy in C6 distribution of his right arm, intermittent paresthesias in left arm, and no myelopathy or motor loss.
An October 2009 MRI of the Veteran's cervical spine indicates that the central canal stenosis observed on the 2008 MRI was relieved as a result of his surgery. See 12/9/09 VBMS Medical Treatment Record Government Facility, page 3. There was a broad-based right lateral disc protrusion or osteophyte at C7-Tl that produced moderate narrowing of the right neural. foramen similar to the 2008 exam.

A December 2009 PMR record shows that the Veteran complained of pain with prolonged sitting more than 30 minutes without head support, difficulty driving with multiple accidents, and left hand numbness. See 2/19/10 VBMS Medical Treatment Record Government Facility, page 23. The impression was chronic cervicalgia with probable left cervical radiculopathy, degenerative disc disease of the cervical spine, and cervical spine stenosis.

A March 2010 SSA disability evaluation notes the Veteran's post-surgery cervical stenosis and complaint of neck pain radiating to both arms with left-sided numbness. See 3/10/10 VBMS Medical Treatment Record Government Facility, page 36. His back pain radiated to his legs. The numbness occurred more on the right side. Pain in the low back, shoulders, neck, and right ribs woke him while sleeping. He had morning stiffness for five hours all over. Weather change worsened the discomfort. Hot showers helped. The Veteran had limited ability to sit, stand, and walk before being limited by discomfort. He has also complained of bilateral and right shoulder pain. 

Range of motion of the Veteran's cervical spine was forward flexion to 50 degrees, extension to 60 degrees, right and left lateral flexion each to 45 degrees, and right and left lateral rotation each to 80 degrees. There were no spasms and motor and sensory function were intact. He had 80 pounds of grip strength in the right hand and 100 pounds of grip strength in the left hand. The Veteran was able to pick up a coin, open a door, and fasten a button.

During the March 2011 VA examination, the Veteran reported that his pain was worse than before the June 2008 surgery. His numbness and tingling improved immediately post-surgery, but the neck pain did not resolve. Now both shoulders hurt and he had shooting pains and numbness down to the fingers. The Veteran believed the surgery actually increased the muscular pains in his neck.

The Veteran had severe flare-ups of cervical neck pain every two to three weeks that lasted for hours and were caused by cold, damp weather and repetitious upper body work. He was right-handed and his left hand grip was now much stronger than his right. The Veteran reported numbness and paresthesias. He had fatigue, and decreased motion of the cervical spine with stiffness, weakness, spasm, and constant, mild, dull, aching pain that sharpened with exertion. The Veteran awoke with pain and stiffness that was worst in the early morning that he rated as four out of 10. He had dull pain that radiated to his right shoulder, biceps, and elbow with occasional sharp pain at night in the left shoulder and arm. The Veteran denied incapacitating episodes of spine disease.

Objectively, the Veteran's posture and head position were normal. The examiner stated that there was cervical spine ankylosis. See March 2011 VA examination report, page 5. Left and right spasm, guarding, and pain with motion, were noted, but no atrophy, tenderness or weakness. There was no muscle spasm, localized tenderness or guarding severe enough to be responsible for an abnormal gait or abnormal spinal contour.

Range of motion of the Veteran's cervical spine was forward flexion from zero to 35 degrees, extension from zero to 20 degrees, left lateral flexion from zero to 20 degrees, right lateral flexion from zero to 25 degrees, left lateral rotation from zero to 30 degrees and right lateral rotation from zero to 20 degrees. There was objective evidence of pain on active motion and no additional loss of motion after repetitions.

Sensory findings on the right upper extremity were normal for vibration, position sense, and pain or pinprick. There was decreased sensation to light touch in the dorsal hand in all distributions. On the left upper extremity, sensory findings were normal to vibration and position sense with decreased sensation to cold and pain or pinprick in the all distributions of the dorsal hand and light touch to the ulnar nerve distribution of the dorsal hand. There were no dysesthesias in either extremity. There was normal muscle tone, no muscle atrophy, and no associated weakness found on examination.

The examiner commented that the Veteran was unemployed from two to five years, having not worked since 2007 due to an inability to perform physical labor. The Veteran missed three weeks of work in four months due to his neck condition. The diagnosis was degenerative osteoarthritis and disc disease of the cervical spine, status post cervical spine surgery. The effect of his cervical spine disability on activities of daily living was that the Veteran had limited neck range of motion that required compensation of turning the whole body for peripheral vision needed during any activities of daily living. The examiner commented that the Veteran's cervical spine examination was basically unchanged from that reported in May 2009.

At the May 2015 VA examination, the examiner noted the Veteran's report of constant pain in his neck, shoulders, and down both arms, numbness in his hands and that he frequently dropped things. The Veteran had flare ups of pain when the weather was hot and muggy or a storm was coming or with any repetitious work or lifting anything over his shoulder level that crippled him up for two or three days. With pain he had reduced ability to lift or perform overhead tasks.

Cervical spine range of motion was forward flexion from zero to 40 degrees, extension from zero to 30 degrees, right lateral flexion from zero to 40 degrees, left lateral flexion from zero to 30 degrees, right lateral rotation from zero to 40 degrees, and left lateral rotation from zero to 30 degrees. The Veteran's combined range of motion of his cervical spine was 210 degrees. There was no localized tenderness, guarding, or muscle spasm. He had intervertebral disc syndrome with no episodes of acute signs of symptoms requiring bedrest prescribed by a doctor. There was objective evidence of painful motion that caused functional loss but no additional loss of motion after repetitions. 

The examiner was unable to state without speculation if pain, weakness, fatigability or incoordination significantly limited functional ability with repeated use over a period of time or with flare ups. However, the examiner explained that the main limiting factor affecting both motion and function, as reported by the Veteran, was pain. During the examination, the Veteran demonstrated optimum effort as demonstrated in the reproducibility of the range of motion measurements with no additional evidence of functional limitation or decreased range of motion. There was no decreased effort as a result of pain, fear of injury, disuse or neuromuscular inhibition. The examiner could not express, without resorting to mere speculation, additional limitation of function or additional range of motion loss or decreased mobility due to pain due to repetitive use over time. Based on the physician-examiner's clinical judgment, it was not feasible to anticipate or predict limitation in function or motion, in specific degrees, with repetitive use.

There was normal strength in the elbows, wrists, and fingers, and no atrophy. Reflexes were hypoactive (1+) in the biceps, triceps, and brachioradialis. There was decreased sensation to light touch in the shoulders, forearms, and hands and fingers. The examiner reported moderate right upper extremity radiculopathy and paresthesias and/or dysesthesias and mild left upper extremity radiculopathy and paresthesias and/or dysesthesias. There was mild right upper extremity numbness and moderate left upper extremity numbness. Nerve roots involved were C5-C6, C7, C8-T1, bilaterally. The examiner reported that the Veteran had mild radiculopathy on the left and right.

There was no ankylosis of the spine. The Veteran had intervertebral disc syndrome but no episodes of acute signs and symptoms due to intervertebral disc syndrome that required bed rest prescribed by a physician and treatment by a physician in the past twelve months. He had a scar that was 5.0 centimeters by 0.2 centimeters that was not painful or unstable.

The examiner reported that the Veteran's cervical spine disability impacted his ability to work. The examiner noted the Veteran's inability to accomplish overhead tasks, do heavy lifting or turn his head sufficiently to drive a truck (his former occupation) or operate heavy equipment. The Veteran's impairments impacted occupational and employment activities as he could only do work at table top level and for limited times due to fatigue. His decreased sensation/numbness in his hands resulted in frequently dropping objects.
Prior to June 26, 2008

Given the fact that forward flexion was only possible to 40 degrees, left lateral flexion to 26 degrees, right lateral flexion to 22 degrees, left lateral rotation to 54 degrees, and right lateral rotation to 66 degrees, before the occurrence of flare-ups (during the November 2007 VA examination), and with consideration of additional functional factors such as severe pain, weakness, and interference with dressing, driving, sitting, or weight-bearing, the Board finds that the impairment from the Veteran's cervical spine disability more nearly approximated a 20 percent disability rating prior to June 26, 2008, and since the initial grant of service connection.

The Veteran reported constant and severe cervical spine pain and rated his flare-ups of spine pain as a five on a scale of 10 that occurred once or twice a month and lasted two or three days. The medical evidence demonstrates that he was unable to take drive long distances, or use a grease gun in his right hand, and had difficulty with daily activities such as dressing and putting on his belt, due to his cervical disability.

Therefore, resolving reasonable doubt in the Veteran's favor, a 20 percent disability rating for the orthopedic residuals of his cervical spine disability, but no more, is warranted since the initial grant of service connection and prior to June 26, 2008. 38 U.S.C.A. § 5107 (b); 38 C.F.R. §§ 4.3, 4.7.

The Board finds that a rating in excess of 20 percent is not warranted prior to June 26, 2008, because the record does not reflect forward flexion of the cervical spine to 15 degrees or less or favorable ankylosis of the cervical spine. Additionally, the medical evidence prior to June 26, 2008, is negative for, and the Veteran has not reported any, doctor-prescribed bedrest for the cervical spine disability. While light duty was recommended by the Veteran's primary care physician in February 2008, the record does not remotely suggest that bedrest was prescribed for neck pain.

Since January 1, 2009

Here, the Board finds that a disability rating in excess of 30 percent is not warranted 
from January 1, 2009, because the record does not reflect unfavorable ankylosis of the entire cervical spine. Additionally, while the March 2011 VA examiner answered yes to whether there was ankylosis of the cervical spine, the Veteran's range of motion at that time was forward flexion from zero to 35 degrees, extension from zero to 20 degrees, left lateral flexion from zero to 20 degrees, right lateral flexion from zero to 25, degrees, left lateral rotation from zero to 30 degrees, and right lateral rotation from zero to 20 degrees, clearly demonstrating that he was able to bend forward and that his cervical spine was not ankylosed or immobile. See Note (5) to General Rating Formula for Diseases and Injuries of the Spine (stating that for VA compensation purposes, unfavorable ankylosis is a condition in which the entire cervical spine, the entire thoracolumbar spine, or the entire spine is fixed in flexion or extension). The May 2015 VA examiner specifically found that there was no ankylosis of the cervical spine. Thus, the weight of the competent medical evidence is against a finding that the Veteran has ankylosis. Additionally, while the May 2015 examiner found intervertebral disc syndrome, treatment records and examination reports are negative for, and the Veteran has not reported any, doctor-prescribed bedrest for the service-connected cervical spine disability.

The Board has also taken into consideration the question of loss of functionality during flare-ups, as required by the Court in Mitchell v. Shinseki, 25 Vet. App. at 43. In the May 2015 examination report, the VA examiner noted that the Veteran had daily discomfort with no significant functional loss due to weakness, fatigability, or incoordination. The Veteran's loss of range of motion during flares was associated with increased physical activity

The Veteran testified to having neck pain "so bad" he "can't do much of anything. See October 2010 Board hearing transcript, page 5. With regard to establishing loss of function due to pain, it is necessary that complaints be supported by adequate pathology and be evidenced by the visible behavior of the claimant. 38 C.F.R. § 4.40. The effects of pain reasonably shown to be due to the Veteran's service-connected cervical spine disability are contemplated in the currently assigned 10 percent and 30 percent ratings. There is no indication that pain or flare-ups, due to disability of the cervical spine, caused functional loss greater than that contemplated by the currently assigned 10 and 30 percent disability ratings. 38 C.F.R. §§ 4.40, 4.45. 

As such, the Board concludes that the preponderance of the evidence is against a disability rating higher than higher than 30 percent assigned since January 1, 2009, for the orthopedic manifestations of the Veteran's service-connected cervical spine disability. Moreover, the evidence is not so evenly balanced as to allow for the application of reasonable doubt. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 4.7, 4.21.

Scar

The Veteran also has a superficial surgical scar that examiners described as well-healed and did not affect motion or function. There is no medical evidence in the claims file of manifestations of the scar that warrant a separate compensable disability rating. 38 C.F.R. § 4.118, Diagnostic Code 7804 (2016).

Left/Right Upper Extremity Radiculopathy

Associated objective neurological abnormalities (e.g., bladder and bowel impairment) are to be evaluated separately. The November 2016 rating decision granted separate 20 percent disability ratings for mild right and left upper extremity radiculopathy from May 6, 2015.

During his October 2010 hearing, the Veteran described shooting nerve pains into his hands that went numb. See October 2010 Board hearing page 5. He also had difficulty holding things. Id.

The Veteran is currently in receipt of initial 20 percent disability ratings, respectively, for the service-connected left and right upper extremity radiculopathy, effective from May 6, 2015.

Diagnostic Code 8513 evaluates upper radicular group (fifth and sixth cervical) paralysis. 38 C.F.R. § 4.124a. Under this code provision, a 20 percent disability rating is warranted for mild incomplete paralysis of the major or minor upper extremity; a 30 percent disability rating is warranted for moderate incomplete paralysis of the minor upper extremity; a 40 percent disability rating warranted for moderate incomplete paralysis of the major upper extremity; a 60 percent disability rating is warranted for severe incomplete paralysis of the minor upper extremity; a 70 percent disability rating is warranted for severe incomplete paralysis of the major upper extremity; an 80 percent disability rating is warranted for complete paralysis of the minor upper extremity; and a 90 percent disability rating warranted for complete paralysis of the major upper extremity. 38 C.F.R. § 4.124a, Diagnostic Code 8513.

Since January 3, 2007, the Veteran's left and right upper extremity radiculopathy appears to have fluctuated during this period from absent or diminished reflexes with radiating pain to essentially minimal neurologic disability. The record indicates that he had diminished or absent reflexes on evaluations during most of the appeal period. See February, March, and April 2008 VA clinical records, discussed supra, and May 2009, March 2011, and May 2015 VA examination reports. Hence, it is appropriate to provide a disability rating that contemplates those manifestations. These manifestations are organic. 38 C.F.R. § 4.123.

The Veteran has reported tingling, numbness, and radiating pain as constant, severe, sharp, aching, and spreading out over the right arm (in November 2007) and left arm (in May 2009) and limiting his ability to grip things. He also reported difficulty dressing and driving. See VA examination reports discussed supra.

The above evidence indicates that the Veteran's left and right upper extremity radiculopathy has been manifested by sharp, chronic, radiating pain to the left and right upper extremities, with intermittent numbness and tingling, and somewhat diminished reflexes at the hands. The orthopedic surgery evaluation in February 2008 diagnosed bilateral upper extremity radiculopathy, but the March 2008 EMG showed mild left chronic C5-6 radiculopathy and, in January 2009, the cervical spine MRI indicated probable left cervical radiculopathy although a neurosurgeon reported that an EMG was inconclusive, without findings of acute radiculopathy. 

The December 2009 PMR record shows probable left cervical radiculopathy, 
although the SSA examiner in March 2010 reported normal sensory findings. In March 2011, the VA examiner reported normal sensory findings on the right upper extremity for vibration, position sense, and pain or pinprick with decreased sensation to light touch in the dorsal hand in all distributions. On the left upper extremity, sensory findings were normal to vibration and position sense with decreased sensation to cold and pain or pinprick in the all distributions of the dorsal hand and light touch to the ulnar nerve distribution of the dorsal hand. There were no dysesthesias in either extremity.

The May 2015 VA examiner diagnosed mild left and right upper extremity radiculopathy.

The probative medical evidence demonstrates that throughout the appeal period the Veteran consistently complained to medical personnel of increased upper left and right extremity symptoms variously assessed as upper extremity radiculopathy. See e.g., Rucker v. Brown, 10 Vet. App. 67, 73 (1997); Fed. R. Evid. 803 (4) and Note to Paragraph (4) (indicating that a statement made for purposes of obtaining treatment possess inherent credibility in light of a claimant's strong motivation to be truthful); see also Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 303 (2008) (holding that the Federal Rules of Evidence are important, guiding factors that may be used by VA adjudicators in evaluating the probative value of a medical opinion). While the November 2007 VA examiner's report (noting a normal neurological findings) is certainly relevant and credible, the Board finds that it is less probative than the Veteran's statements to his treatment providers and the medical records of his treatment during the appeal period.

Accordingly, the Board finds that the Veteran is entitled to respective initial 20 percent disability ratings for left and right upper extremity neurological impairment under Diagnostic Code 8313 throughout the appeal period since January 3, 2007. The benefit of the doubt has been resolved in the Veteran's favor to this extent regarding this material issue. 38 U.S.C.A. § 5107 (b).

Moderate incomplete paralysis of either upper extremity has not been shown at any time during the appeal period. Thus, no more than 20 percent disability ratings are warranted for left and right upper extremity radiculopathy at any time during the appeal period. 38 C.F.R. § 4.124a, Diagnostic Code 8513.

TDIU

The Veteran maintains that he is unable to work due to his cervical spine disability and reported that his primary care physician provided a note for his employer that he was to be placed on "light duty". See 5/28/08 VBMS Correspondence. He was not to do repetitive work and not lift over 10 to 25 pounds. His job at a stone company was in maintenance. He worked on trucks, forklifts, and all the machines in the shop (that included cutting and shaping stones). The company policy was that he had to lift 50 pounds and do repetitive type work, such as lifting heavy steel rollers, welding, using a sledge hammer, and greasing hundreds of bearings. The Veteran's supervisor indicated that the company did not have any light work for him at the time and sent me home. This happened on March 14, 2008, and he was unemployed since that time.

The Veteran also stated he was unable to keep his job as a maintenance man at a stone company because it checked with VA clinicians and was advised that he had numbness in his arms, hands, and fingers. See 5/19/09 VBMS Correspondence. The numbness also caused lack of coordination and the company feared that he might fall off the equipment because he fell from a bobcat. He needed proof from a VA doctor before he would be allowed back to work. Surgery was ultimately recommended and before the operation his physician would not release him, and recommended that he only be allowed to lift ten pounds that was less than the Veteran's job requirement. The Veteran was without a job since March 2008.

The Veteran testified that he was fired from his last job as a mechanic because of his inability to hold things and drive a truck due to his cervical spine disability. See October 2010 Board hearing transcript, pages 4, 6. The Veteran was unable to drive back and forth to work in order to hold a job. Id. at 6.

A total disability rating may be granted where the schedular rating is less than 100 percent if the Veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities. Generally, to be eligible for a TDIU, the following percentage thresholds must be met: if there is only one service-connected disability, it shall be ratable at 60 percent or more; if there are two or more service-connected disabilities, there must be at least one disability rated at 40 percent or more and sufficient additional disabilities to bring the combined overall rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a). 

For the above purpose of one 60 percent disability, or one 40 percent disability in combination, disabilities of one or both upper extremities, or of one or both lower extremities, including the bilateral factor, if applicable, will be considered as one disability. See 38 C.F.R. §§ 4.16 (a), 4.26.

Under 38 C.F.R. § 4.26, when a partial disability results from a disease or injury of both arms or legs, the ratings for the disabilities of the right and left sides will be combined as usual under 38 C.F.R. § 4.25 (2016), and 10 percent of this value will be added (i.e. not combined) before proceeding with further combinations, or converting to degree of disability. This is known as the bilateral factor.

Here, in light of the Board's present decision, service connection currently is in effect for cervical spine disability, and left and right upper extremity radiculopathy, each rated as 20 percent disabling, and lumbar spine disability, rated as 10 percent disabling, all from January 3, 2007; cervical spine disability rated as 30 percent disabling from January 1, 2009; and left lower extremity radiculopathy, rated as 20 percent disabling from May 6, 2015.

Given the Board's determination, herein, the Veteran's service-connected disabilities have met the schedular criteria throughout the appeal period. The Veteran's disabilities of the bilateral upper extremities and cervical spine share a common etiology, as they stem directly or indirectly from injuries he sustained during active service. Therefore, because these disabilities stem directly or indirectly from the Veteran's inservice injury, they are considered one disability under 38 C.F.R. § 4.16 (a) for the purposes of considering entitlement to a TDIU. Using the combined ratings table in section 4.25, the Veteran's disabilities of the bilateral upper extremities have a combined rating of 36 percent. Applying the bilateral factor, 3.6 percent is added to this value, resulting in a combined rating of 39.6 percent. See 38 C.F.R. § 4.26. The cervical spine disability is rated as 20 percent disabling. This results in a combined rating of 60 percent, rounding to the nearest 10 percent, effective from January 3, 2007. See 38 C.F.R. Â§ 4.25. As such, the schedular criteria were met throughout the pendency of this appeal. See 38 C.F.R. §§ 3.340, 4.16(a).

If a Veteran's service-connected disabilities meet the percentage requirements of 38 C.F.R. § 4.16 (a), and the evidence of record indicates that he is unable to maintain substantially gainful employment due to his service-connected disabilities, his claim for a total disability rating based on unemployability cannot be denied in the absence of medical evidence showing that he is capable of substantially gainful employment. See Friscia v. Brown, 7 Vet. App. 294, 297 (1994).

Consideration may be given to the Veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to his or her age or to the impairment caused by nonservice- connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19; see also Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

The claim for TDIU is an element of all claims for an increased rating. Rice v. Shinseki, 22 Vet. App. at 447.

The Board finds that the evidence is at least in equipoise as to whether the Veteran is unable to engage in substantially gainful employment as a result of his service-connected disabilities.
 
The central inquiry is "whether the Veteran's service-connected disabilities alone are of sufficient severity to produce unemployability." Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). The Veteran need not show 100 percent unemployability in order to be entitled to a TDIU. Roberson v. Principi, 251 F.3d 1378, 1385 (Fed. Cir. 2001).

The evidence shows that the Veteran is disabled by service-connected cervical and 
lumbar spine and bilateral upper and left lower extremity radiculopathy disabilities, as well as non-service-connected heart, carpal tunnel syndrome, and other disabilities.

The November 2007 and May 2009 VA examiners noted that the Veteran had difficulty driving. The May 2009 examiner reported that the Veteran worked as a maintenance truck driver, was laid off due to his neck problem, and had difficulty with pain due to bouncing of the vehicle and pain on turning his head to observe traffic. The May 2011 examiner noted that the Veteran's limited neck range of motion required compensation of turning his whole body for peripheral vision needed during any activity of daily living. The examiner recorded the Veteran's report that he had not worked since 2007 due to an inability to perform physical labor, and missed three weeks of work in four months due to his neck disability.

The May 2015 VA examiner found that the Veteran's cervical spine disability impacted his ability to work and reported that the Veteran was unable to accomplish overhead tasks, do heavy lifting or turn his head sufficiently to drive a truck (his former occupation) or operate heavy equipment. The examiner commented that the impairments impacted occupational and employment activities as the Veteran could only do work at table top level and for limited times due to fatigue. The Veteran's decreased sensation/numbness in his hands resulted in frequently dropping objects.

In a work history prepared in conjunction with his claim for SSA benefits, the Veteran reported work experience as a truck driver most recently from 2005 to 2006, a mechanic in 2004, and a maintenance worker from 2007 to 2008. See 6/18/10 VBMS Medical Treatment Records Furnished by SSA.

A Residual Functional Capacity Questionnaire completed by a physician in December 2009 indicates that the Veteran should not lift more than 10 pounds or work with his arms or hands above chest level. See 11/12/10 VBMS Medical Treatment Record Non Government Facility. It was noted that the Veteran was likely to be absent from work due to his impairments more than four times a month. The physician stated that the Veteran had great difficulty and severe limitations with head and neck rotation, that made it unsafe for him to drive any vehicle.
A Physical Residual Functional Capacity Assessment in March 2010 prepared in conjunction with the Veteran's SSA claim, indicates that he did heavy work until 2008 and was limited to lifting 25 pounds, and standing and walking to 6 hours a day as well as reaching all directions including overhead. See 10/10/14 VBMS Medical Treatment Records Furnished by SSA, page 4. 

Here, the probative evidence of record demonstrates that the Veteran is significantly disabled by service-connected cervical spine disability and bilateral upper extremity radiculopathy, as well as lumbar spine disability and lower extremity radiculopathy. Moreover, medical professionals have considered the Veteran's ability to work. In February 2008, the Veteran's primary care physician advised light duty given the nature of the Veteran's occupation that required significant bending and lifting. But the May 2011 examiner noted the Veteran's need to turn his entire body for peripheral vision due to limited neck motion, and the May 2015 examiner stated that the Veteran could only work at a table top and for limited times.

The Veteran's only reported employment experience has been in jobs requiring significant ability to ambulate or be physically active.

The Veteran has reported that he worked as truck driver, mechanic, and maintenance worker, and did not report any other work experience. His cervical and lumbar spine disabilities cause difficulty in activities involving strenuous physical activity. It is difficult to envision gainful non-sheltered employment that would permit such accommodations. In fact, the Board finds it probative that the SSA found the Veteran totally disabled and eligible for benefits since March 31, 2008, due, primarily, to his service-connected cervical spine disability and, secondarily, to a non-service connected heart disorder, 

Based on the foregoing and with consideration of the Veteran's physical impairment, work history, and training, the Board finds that the evidence is at least in equipoise as to whether the Veteran's service-connected disabilities prevent him from securing and following substantially gainful employment consistent with his education and occupational experience. In reaching this determination, the Board acknowledges that the Veteran has non-service-connected disabilities that affect his ability to work. Nevertheless, the Court has held that determinations of unemployability are legal questions and medical opinions are not entirely dispositive. See Geib v. Shinseki, 733 F.3d 1350, 1354 (Fed. Cir. 2013). 

Thus, the Board concludes that the evidence is deemed to be at least in equipoise on the essential question at issue, whether the Veteran is precluded from employment due to his service-connected disabilities.

When a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. In Gilbert, supra, the Court stated that "a Veteran need only demonstrate that there is an 'approximate balance of positive and negative evidence' in order to prevail." In Gilbert, the Court specifically stated that entitlement need not be established beyond a reasonable doubt, by clear and convincing evidence, or by a fair preponderance of the evidence. Under the benefit of the doubt doctrine established by Congress, when the evidence is in relative equipoise, the law dictates that the appellant prevails. 

Resolving reasonable doubt in the Veteran's favor, the Board finds that a TDIU is warranted. The Board has not set a specific effective date for the beginning of the TDIU, so as to permit the agency of original jurisdiction to set an effective date in the first instance, and afford the Veteran the opportunity to submit evidence and argument as to that issue.


ORDER

An initial 20 percent disability rating for service-connected cervical spine disability from January 3, 2007, to June 25, 2008, is granted, subject to the applicable criteria governing the payment of monetary benefits.

A disability rating higher than 30 percent for service-connected cervical spine disability since January 1, 2009, is denied.

An initial 20 percent disability rating for service-connected left upper extremity radiculopathy, from January 3, 2007, is granted, subject to the applicable criteria governing the payment of monetary benefits.

An initial 20 percent disability rating for service-connected right upper extremity radiculopathy, from January 3, 2007, is granted, subject to the applicable criteria governing the payment of monetary benefits.

A TDIU is granted.




____________________________________________
DEMETRIOS G. ORFANOUDIS
Acting Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs